UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
NURIT KALDERON, Ph.D.,                        :

               Plaintiff,                    :          08 Civ. 9440 (RJS) (THK)

                      :

       -against-                        :          **REPORT AND RECOMMENDATION**

                      :
DIRECTOR, ROBERT FINKELSTEIN,                 :
Ph.D., DIVISION OF EXTRAMURAL                 :
RESEARCH, NATIONAL INSTITUTE OF               :
NEUROLOGICAL DISORDERS AND STROKE,            :
in his individual and official                :
capacities, et al.,                           :

               Defendants.                  :
-----------------------------------X

FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.
TO: THE HON. RICHARD J. SULLIVAN, UNITED STATES DISTRICT JUDGE.

      Plaintiff Dr. Nurit Kalderon ("Plaintiff") brings this action against eight defendants (collectively, "Defendants"): (1) the Division of Extramural Research, National Institute of Neurological Disorders and Stroke ("DER/NINDS" or "NINDS"), a federal agency; (2) Dr. Robert Finkelstein ("Finkelstein"), Director of DER/NINDS; (3) Dr. Joseph J. Pancrazio ("Pancrazio"), a Program Official at the Repair and Plasticity Cluster of DER/NINDS; (4) Edward D. Myrbeck ("Myrbeck"), former section chief of the Grants Management Branch at DER/NINDS; (5) Maxine Davis-Vanlue ("Davis-Vanlue"), former Acting Chief Grants Management Officer at DER/NINDS, and supervisory Grants Management Officer at DER/NINDS; (6) Tijuanna E. DeCoster

("DeCoster"), Chief Grants Management Officer at DER/NINDS; (7) Patricia A. Kvochak ("Kvochak"), an employee at the Department of Health and Human Services ("HHS"); and (8) Karen Plá ("Plá"), a staff member at HHS Freedom of Information/ Privacy Acts Division, serving as a National Institutes of Health ("NIH") Privacy Act Officer.

Plaintiff alleges that her rights as the Principal Investigator on an NIH grant were violated. Specifically, (1) the individually named Defendants (the "Individual Defendants") violated her rights under the First and Fifth Amendments of the United States Constitution; (2) Defendants Kvochak, DeCoster, Davis-Vanlue, and Pancrazio violated her rights under 42 U.S.C. § 1985(2); (3) Defendant Finkelstein violated her rights under 42 U.S.C. § 1986; (4) Defendants DER/NINDS and Finkelstein violated her rights under various provisions of the Privacy Act, 5 U.S.C. § 552a, et seq. (the "Privacy Act" or the "Act").

Currently before the Court are Defendants' motion to dismiss the Complaint and/or motion for summary judgment on Plaintiff's Privacy Act claims, and Plaintiff's cross-motion for partial summary judgment on her eighth cause of action under the Privacy Act. The motions were referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and Rule 72.1(d) of the Southern District of New York

Local Civil Rules.   For the reasons that follow, this Court recommends that Defendants' motion to dismiss be granted as to all claims except for Plaintiff's Eighth Cause of Action.[1]   The Court also recommends that Plaintiff's cross-motion for summary judgment be denied, and further, that Plaintiff's Eighth Cause of Action be dismissed as a matter of law.

## FACTUAL BACKGROUND

In deciding Defendants' motion to dismiss, the well-pleaded facts in the Complaint are taken as true.   The 125-page Complaint, however, belongs to the everything-but-the-kitchen-sink school of thought.   Although not filed pro se, the Complaint is extremely difficult to follow because of its extreme length and purported factual detail.   The factual allegations are often repetitive, inconsistent, and contradicted by documents referenced in the Complaint.   Thus, the Court, unlike its authors, exercises discretion in culling from it only those facts relevant to Plaintiff's claims.   See Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) ("[W]hen a complaint does not comply with the requirement that it be short and plain, the

---

[1] The District Judge (Hon. Richard J. Sullivan) struck that portion of Defendants' Memorandum of Law in Support of Their Motion to Dismiss and/or for Summary Judgment relating to Plaintiff's Eighth Cause of Action.   (See Order, dated June 22, 2010.)   Accordingly, this Court has not considered that aspect of Defendants' motion.

court has the power . . . to strike any portions that are redundant or immaterial . . . .").

In setting forth the factual background of the case, the Court, therefore, relies on the Complaint's well-pleaded allegations, documents referenced in the Complaint, and applicable regulations, to the extent that they provide context for the Complaint's factual allegations.[2]

I.   Biomedical Research Today

Scientific and medical research today is a highly-regulated affair, and one in which the hand of government plays a decisive part.   In the present era, the United States government spends billions of dollars each year funding scientific and medical research, with federal agencies serving as the vital organs through which funds are funneled.

In this setting, the principal administrative body for

---

[2] While, on a motion to dismiss, the Court accepts as true the well-pleaded facts in the Complaint, federal courts may also take judicial notice of the regulations of federal administrative agencies.   See 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . ."); 44 U.S.C. § 1510 (authorizing Code of Federal Regulations as a special or supplemental edition of the Federal Register); see also Crimm v. Mo. Pac. Ry. Co., 750 F.2d 703, 709-10 (8th Cir. 1984); Universal Express, Inc. v. SEC, 177 F. App'x 52, 53 (11th Cir. 2006)(a district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment); see also United States v. Bradford, 160 F.2d 729, 731 (2d Cir. 1947) (courts may take judicial notice of the regulations of a federal administrative agency); United States v. Knauer, 635 F. Supp. 2d 203, 205 n.2 (E.D.N.Y. 2009)(same).

medical research today is NIH, a subordinate agency within HHS. NIH sponsors intramural and extramural biomedical research projects through an apparatus of 27 institutes and centers, each pursuing its own designated research mandate, albeit in conformity with NIH's global mission.   In 2007 alone, the NIH Office of Extramural Research awarded a total of $20.4 billion dollars in research grants, providing funding for 37,275 research projects.   (See Second Amended Complaint, dated Apr. 30, 2009 ("Compl."), ¶ 3.)

A complex web of government oversight machinery administers and monitors the vast quantities of federal money at stake.   So it is that each NIH institute has a Grant Management Branch ("GMB") which manages and disburses a given institute's grant awards.   Further, located within the NIH Office of Policy for Extramural Research Administration ("OPERA") is the Division of Grants Compliance and Oversight ("DGCO"), which is responsible for "the overall monitoring for compliance and provides assistance in administration and disbursement of all NIH grant awards by the respective NIH staff and the expenditures of the awards by the awardee institutions."   (See id. ¶ 4.)

NINDS, the agency at the heart of this dispute, is an institute within NIH.   NINDS's statutory mission is to support research programs relating to neurological diseases and traumas.

5

Accordingly, NINDS awards research grants in support of extramural research, through its Division of Extramural Research. Program Officials ("PO") at DER/NINDS oversee the administration of such grants. Each PO is responsible for grants relating to designated categories of research into neurological disorders. (See id. ¶ 5.)

II. <u>NIH Research Project Grants: The Agency, Grantee Institution, and Principal Investigator Relationship</u>

The grant at the center of this dispute is a Research Project Grant ("R01 grant"). Each R01 grant has a Principal Investigator ("PI"). Typically, the PI initiates a research project by writing a grant proposal and obtaining the sponsorship of a "host" institution, such as a university or research institute, which serves as the grantee institution ("grantee" or "recipient"). <u>See</u> 45 C.F.R. § 74.2. The grant applicant is the would-be grantee institution, and not the PI. (<u>See</u> Compl. ¶ 26.) In fact, a PI "cannot submit grant applications without having first secured a sponsoring institution." (<u>See</u> <u>id.</u>) If a grant proposal is successful, meaning that NIH (or a subordinate awarding agency) decides to award funding, NIH issues a Notice of Grant Award ("NGA") to the grantee institution, allowing the research project to go ahead.

The NGA is the governing legal document for the

arrangement, notifying the grantee that an award has been issued. The grantee is the legal recipient of the award. NIH has a direct contractual relationship with the grantee, not the PI, who is an employee of the grantee. See 45 C.F.R. § 74.2; see also NIH Grants Policy Statement[3] ("NIHGPS"), at 18.)

The grantee accepts the award by withdrawing funds or communicating a request for funds. See NIHGPS, at 18. Although the grantee institution is the legal recipient that holds the funds, the PI has certain oversight and management obligations relating to "scientific and financial aspects of the grant." (See Compl. ¶ 7.) Further, the grantee must have "a formal written agreement with the PI that specifies an official relationship between the parties." See NIHGPS, at 18. Thus, Plaintiff asserts that the PI is "a member of the grantee team responsible for ensuring compliance with the financial and administrative aspects of the award." (See Compl. ¶ 7 (quoting NIHGPS).)

The grantee institution may relinquish a grant, for any reason, upon written notification to the awarding agency. See

---

[3] The NIHGPS, referenced in the Complaint, sets forth the terms and conditions for all NIH grant awards, effective December 1, 2003. See National Institutes of Health, Award Process, http://grants.nih.gov/grants/managing_awards.htm#award. NIHGPS, by superceding the PHS Grants Policy Statement (revised Apr. 1, 1994), applies to all NIH grants. See 42 C.F.R. § 52.8.

45 C.F.R. § 74.61(a)(3); see also NIHGPS at 137.[4]  If the PI wishes to transfer an R01 grant from one institution to another, NIH approval is required.  (See Compl. ¶ 32.)  The PI has no inherent right to transfer a grant.  See NIHGPS, at 108-09.  A new institution must submit an application to secure the transfer of a grant.  See NIHGPS, at 108; Compl. ¶ 32.  The decision to permit or deny a change of grantee institution is within NIH's discretion.  See 42 C.F.R. § 52.6(f); see also NIHGPS, at 108-09.  In reviewing a transfer application, NIH may request additional information from the proposed grantee institution.  See NIHGPS, at 109.

   An NIH grant may be terminated under only three circumstances: (i) by the awarding agency, if a grantee fails to comply with the terms and conditions of an award; (ii) by the awarding agency with the consent of the grantee; or (iii) by the grantee, upon sending to the awarding agency written notification setting forth the reasons for the termination, the effective date, and, in the case of partial termination, the portion to be terminated.  See 45 C.F.R. § 74.61(a).  Any termination for cause by NINDS would require an official notice to the grantee providing an opportunity for a hearing to

---

[4]  The Complaint mischaracterizes the law in suggesting that "[a] grantee institution can relinquish its rights to an NIH grant only when the PI resigns its position and moves to another

administratively appeal the termination.  See id. § 74.62(b).

DER/NINDS maintains a system of records containing official grant files documenting the administration of research grants, the contents of which is subject to the Privacy Act.  (See Compl. ¶ 8.) See also 5 U.S.C. § 552a(e)(1).

III. Plaintiff's Allegations

Plaintiff is a biomedical research scientist.  She was the PI on an NIH research grant, number R01 NS39375 (the "Grant" or "NS-Grant"), for a research project entitled "Pre-Clinical Studies in Spinal Cord Injury Repair."   In essence, the Complaint alleges that (1) NINDS agreed to fund Plaintiff's research project in a six-year grant exceeding $2 million, without any apparent problems in the first five years of the Grant, and (2) NINDS acceded to Plaintiff's requests to transfer the Grant, first to the College and then to NYU.  Nevertheless, because Plaintiff ended up in a dispute with the College which, as her employer, terminated her position at the College during the last year of the Grant, with less that $225,000 in funding remaining in the Grant, NINDS and the Individual Defendants conspired to defraud Plaintiff of money in the Grant, sabotage her research, tarnish her professional reputation, and destroy her career.

---

institution."  (See Compl. ¶ 21(c)(i).)

A.   NINDS Transfers the Grant from Sloan Kettering to the
New York College of Podiatric Medicine

NINDS originally awarded the Grant to Sloan Kettering Institute for Cancer Research ("Sloan-Kettering"), in August 2000. Sloan Kettering was the grantee institution and Plaintiff was the PI. The Grant award amounted to $2,382,457.00, and was for the period August 22, 2000 to July 31, 2006. Through November of 2005, Plaintiff conducted her research from laboratories at Sloan Kettering. (See id. ¶ 43.)

In February 2005, Plaintiff was appointed as a Research Associate Professor of Pre-Clinical Sciences at the New York College of Podiatric Medicine ("NYCPM" or "the College"). (See id. ¶ 57.) The College represented to Plaintiff that it would support the funded research project and provide Plaintiff with the necessary laboratory for this purpose. Plaintiff, therefore, sought to transfer the Grant to the College, and on November 1, 2005, the College submitted to NINDS an application to transfer the Grant. (See id. ¶¶ 57, 61.) Upon Plaintiff's request, Sloan-Kettering relinquished to NINDS the unexpended funds of the Grant, amounting to $203,132.00, effective November 30, 2005. (See id. ¶¶ 39, 56, 60.)

On December 7, Ms. Kimberly Campbell, a GMB official, informed Plaintiff that NINDS had approved the transfer of the

10

Grant to the College, effective December 1, 2005, "and that the Notice of Grant Award was due within a week." (See id. ¶ 62.) On January 3, 2006, NINDS issued an NGA transferring the Grant to the College for the budget period January 1 to July 31, 2006. (See id. ¶¶ 63, 69.) Plaintiff contends that the NGA should have had December 1, 2005 as its start date, rather than January 1, 2006. And, despite Plaintiff's protestations, NINDS officials failed to make Plaintiff's desired corrections. (See id. ¶¶ 71-73.)

### B. Breakdown of Plaintiff's and the College's Relationship

Plaintiff claims that the College failed to provide the promised "minimal facilities required for conducting biomedical research." (See id. ¶¶ 75-78.) And, following Plaintiff's protestations, the College "refused to give [Plaintiff] access to her Grant funds, refused to sponsor the submission of the competitive grant renewal application, and tried to force her into the College even though the facilities were dilapidated." (See id. ¶ 78.) Plaintiff argues that this was enough for NINDS to terminate for cause the College's grantee status.

Plaintiff's dispute with the College intensified. On March 6, 2006, the College "expelled [Plaintiff] from its faculty and prohibited her from entering its premises." (See id. ¶ 21(c).)

On March 8, 2006, the College terminated Plaintiff's faculty appointment and employment. (See id. ¶ 88.) Next, the College informed NINDS that it wished to relinquish the Grant to NINDS, providing the reason that Plaintiff had refused to report to work and begin her research project. (See id. ¶¶ 85-87.) Plaintiff asserts that the College's professed justification for terminating her employment was a fabrication.

On June 8, 2006, the College submitted a relinquishing statement to NINDS (which was dated May 1, 2006) and a letter averring to its termination of Plaintiff's employment. On June 28, 2006, NINDS issued a revised NGA, terminating the College's grantee status effective April 30, 2006. (See id. ¶ 143.) The revised NGA reported that the College had returned $78,425 in unexpended grant funds, and retained $124,707 as expended funds, which went, in part, to cover the College's F&A costs.[5] (See id. ¶ 139.)

Plaintiff accused the College of grave irregularities and fraud. First, the College was not entitled to retain the $124,707, which Plaintiff characterizes as a "fraudulent payment" given that (i) the College "failed to materially comply with the NS-Grant's contractual terms"; (ii) "[Plaintiff's] funded project was never performed at [the College]"; and (iii)

---

[5] "F&A costs" are facilities and administration costs. (See id.

there was no "required agreement" on F&A costs between HHS and the College that would entitle the College to reimbursement of indirect costs.   (See id. ¶¶ 21(a) & (c)(i), 63-67, 140-43.) Second, the College submitted a relinquishing statement that falsely conveyed that Plaintiff "resigned" her position as PI. NINDS processed the relinquishing statement, but did not draft it.   (See id. ¶ 138.)   On Plaintiff's inference, this statement was fatal to her reputation and future employment prospects as it implies she "abandoned" her research.   (See id. ¶¶ 21(c), 37; see also Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss and for Summary Judgment, dated July 24, 2009 ("Pl.'s Mem."), at 4, 17.)

C.   Defendants' Role in the College's "Fraud"

Plaintiff claims that Defendants "colluded with the College in the fraudulent handling of the NS-Grant and [Plaintiff's] funded project" by (i) knowingly refusing to investigate the College's misconduct, (ii) circumventing an agency "order" to terminate the College for cause, and (iii) falsifying the Grant record.   (See Compl. ¶¶ 123-30.)

1.   Defendants' Failure to Investigate

Plaintiff contends that she made numerous attempts to communicate with Defendants Myrbeck, Pancrazio, Davis-Vanlue,

¶ 24.)

and DeCoster regarding the College's alleged misconduct and
irregularities with the Grant.  According to Plaintiff, they
failed to "conduct the legally mandated investigation" into her
grievances.[6]  (<u>See</u> <u>id.</u> ¶ 21(a).)

Instead, on the basis of "unlawful" <u>ex</u> <u>parte</u> communications
with the College's representative, Dr. Eileen Chusid, these
Defendants wrongfully permitted the College to submit a
relinquishing statement, rather than terminating the College for
cause. (<u>See</u> <u>id.</u> ¶ 130.)  Plaintiff contends that the College's
relinquishing statement contained serious falsehoods, and by
processing it, Defendants "facilitated" issuance of the
"fraudulent [NGA] with the payment of $124,707 to the College,"
and adopted the College's "false" version of events.  (<u>See</u> <u>id.</u> ¶
21(c).)

The alleged falsehoods were that Plaintiff failed to move
into the College's facilities; that Plaintiff refused to perform
her duties; and that she abandoned her research while continuing
to collect salary.  (<u>See</u> <u>id.</u> ¶ 87.)  Again, Plaintiff argues
that such statements were an anathema to her career.  Still

---

[6]  Plaintiff alleges that Defendants Myrbeck and Pancrazio
were unresponsive to her requests that NINDS investigate and
audit the College's misconduct apropos the Grant.  Further, they
ignored her April 6, 2006 email request that the College be
terminated for cause and that the College be stripped of its
grantee status.  (<u>See</u> <u>id.</u> ¶¶ 126-29.)

14

further, Plaintiff claims that Defendants intentionally adopted the "false" version of events in order "to kill [Plaintiff's] research project, professional reputation and livelihood." (See id. ¶ 20.)

### 2. Defendants "Circumvent" Agency's "Order" Terminating the College for Cause

Plaintiff asserts that before Defendants wrongfully processed the College's relinquishing statement, the agency's Chief Grants Management Officer, Mr. Michael Loewe ("Loewe"), issued an "order," on March 9, 2006, that (i) retroactively terminated the College's rights to the Grant on February 22, 2006, and (ii) authorized Plaintiff to transfer the Grant to a new grantee institution. (See id. ¶ 21(b).) Plaintiff draws the conclusion that Loewe issued this "order" from an email sent on March 9, which she only partially quotes in the Complaint. The email is from Loewe to Chusid. In full, it states:

> Eileen [Chusid]
>
> I have consulted with the NIH Grants Policy Office about the letter and the most appropriate way to procede [sic]. I want to clarify that my intrepetion [sic] is that we are terminating the grant rather than relinquishing it. Relinquishing usually refers to allowing another grantee to have rights to the research. In this case the NINDS will proceed with ending the grant on the date of the letter (February 22, 2006).
>
> As for the grant no funds can be expended

> after the grant end of 2/22/2006.[7]
>
> I will revise the NGA and send an e-mail to all involved <u>if you [the College] respond in agreement.</u>
>
> Mike [Loewe]

(See <u>id</u>. ¶ 112; Declaration of Nurit Kalderon, Ph.D., dated July 24, 2009 ("Kalderon Decl."), Exhibit ("Ex.") B.)  Nowhere in this email is it suggested that the grantee would be terminated <u>for cause</u>.  In any event, Chusid claims never to have received the email (<u>see</u> Compl. ¶ 116), and nothing in the Complaint indicates that the College did "respond in agreement."  Shortly thereafter, Loewe moved to another institute within NIH.  (<u>See</u> <u>id.</u> ¶ 123.)  And, with Loewe out of the picture, Plaintiff contends that Defendants circumvented the March 9, 2006 "order" in three ways, all "in violation of federal statutes and NIH regulations." (<u>See</u> <u>id.</u> ¶ 124.)

First, on April 7, 2006, Defendants "illicitly reinstated" the College's grantee status (<u>see</u> <u>id.</u> ¶¶ 21(c), 123-27), and allowed it to make "open-ended expenditures."  (<u>See</u> <u>id</u> ¶ 21(c)(i).)  Defendant Myrbeck apparently did this by (i) knowingly permitting Chusid to submit a "falsified"

---

[7]  Plaintiff also cites correspondence with Loewe regarding suspension and ultimate termination of the College's grantee status. (<u>See</u> <u>id.</u> ¶¶ 118-22.)

relinquishing statement on behalf of the College, and (ii) "unlawfully authoriz[ing] [the College] to relinquish its rights in June 2006." (See id. ¶ 21(c)(i).)

Second, according to Plaintiff, in April 2006 Defendants wrongfully refused to consider Plaintiff's application for the transfer of the Grant to a newly identified grantee institution. (See id. ¶ 21(c)(ii).) Further, in July 2006, the University of California, Los Angeles (UCLA) "expressed an interest to sponsor [Plaintiff's] NS-Grant and was declined the application for transfer because no funds were available anymore in the NS-Grant." (See id.) Plaintiff claims that Pancrazio, Myrbeck, and Davis-Vanlue "withdrew," without legal authority, the remaining sum of $78,425 from the Grant, thereby "killing Kalderon's research project and her livelihood." (See id. ¶¶ 21(c)(i), 132-36, 147.)

Third, Plaintiff claims that through the aforementioned conduct, Defendants "de facto and effectively removed [Plaintiff] as the PI of the NS-Grant." (See id. ¶ 21(c)(i).)

### 3. Defendants "Falsified" the Grant Record

Defendants' next course of alleged misconduct was NINDS's incorporation of a statement in an internal "official communication" suggesting that Plaintiff had "abandoned" her research project in March 2006; that her PI status was

terminated; and, that her legal contractual rights to the Grant were abolished. Myrbeck, for example, falsely claimed in email communications with other Defendants that the College "fired" Plaintiff because she "never show[ed] up for work"; that Plaintiff failed to reply to Chusid before being fired; that Plaintiff made no "formal moves" to transfer the Grant; and, that Plaintiff was removed from the research project as PI. (See id. ¶¶ 152-57.)   From this, Plaintiff contends that Defendants "knowingly falsified" the Grant record.   (See id. ¶ 21(d).)

D.   Plaintiff's Whistleblower Action Against the College

On October 30, 2006, Plaintiff initiated an action against the College under the False Claims Act ("FCA"), 31 U.S.C. § 3729.  (See id. ¶ 192.)   The FCA permits a private party to initiate a civil action alleging fraud on the Government, which is the real party in interest.   See United States ex rel. Eisenstein v. City of New York, --- U.S. ----, ----, 129 S. Ct. 2230, 2232 (2009).  In connection with that lawsuit, on April 5, 2007, Plaintiff served upon Defendants Pancrazio and Myrbeck, among others, subpoenas to testify in depositions and produce documents.  (See Compl. ¶ 200.)   In May and June of 2007, Defendant Kvochak produced documents on behalf of NIH. Plaintiff claims that Kvochak's submissions were deficient.   In

July 2007, the parties settled the whistleblower action. As a result, the College returned $106,807.55 in unexpended Grant funds to NINDS, retaining $17,905.81. (See id. ¶¶ 192, 238.)

Further, in October 2007, Plaintiff claims that the NIH "[DGCO] terminated [the College's] grantee status for cause in its entirety forcing it to restore the [remainder of] the misappropriated $124,707 back into the NS-Grant." (See id. ¶ 21(a).) Plaintiff claims that "the decision by [DGCO] followed a swift audit based, in part, on depositions obtained in the whistleblower action under the False Claim [sic] Act in Federal court [sic] against the College." (See id. ¶¶ 21(a), 192.)

As it happens, DGCO is not permitted to unilaterally and retroactively terminate a grantee for cause, without the involvement of the awarding agency — NINDS. This is because, by regulation, it is NINDS that has the authority to bring enforcement actions against grantee institutions that materially fail to comply with the terms and conditions of the grant award. See 45 C.F.R. §§ 74.62(a), 74.61(a)(1); see also NIHGPS, at 136-37. Moreover, any termination for cause must be accompanied by an official note to the grantee institution providing an opportunity for a hearing to administratively appeal the termination. See 45 C.F.R. § 74.62; 43 C.F.R. § 16.3; and 45 C.F.R. Part 16, Appendix A, Section C (a)(2).

E.   <u>NINDS Transfers the Grant to NYU</u>

In the summer of 2006, after the College relinquished the Grant and before settlement of the whistleblower case, Plaintiff identified UCLA and NYU as potential grantee institutions to which to transfer the Grant. (<u>See</u> Compl. ¶ 220.)   Plaintiff "preferred to have the grant transferred to NYU," and, on February 14, 2007, NYU granted Plaintiff "institutional PI status." (<u>See</u> <u>id.</u> ¶ 222.)   NYU was "ready" to serve as grantee. (<u>See</u> <u>id.</u> ¶ 187.)

Plaintiff claims that while the whistleblower action proceeded, Defendants conspired to prevent the restoration of the research project at NYU.   Defendants Kvochak, Davis-Vanlue, Pancrazio, and DeCoster, among others, "ordered an illegal embargo on the submission of application [sic] to transfer [Plaintiff's] NS-Grant to NYU" until determination of the whistleblower action. (<u>See</u> <u>id.</u> ¶¶ 21(f)(ii), 226.)[8]   Plaintiff cites emails from NYU staff suggesting that NINDS would not communicate with NYU. (<u>See</u> <u>id.</u> ¶ 228.)

According to Plaintiff, in August 2007, however, Defendants were apparently "forced by [DGCO] to accept submission of the

---

[8] Significantly, the Complaint concedes that NYU did not actually submit any formal transfer application until September 2007, two months after settlement of the whistleblower action. (<u>See</u> Compl. ¶ 257.)

[transfer] application." (See id. ¶ 21(f)(ii).) On August 31, 2007, DeCoster sent an email to Kari Hodges ("Hodges"), the NYU Sponsored Research Administrator, on which she copied Plaintiff and Kvochak. DeCoster instructed Hodges on the application process necessary to transfer the grant to NYU. (See id. ¶ 246.) On September 17, 2007, Hodges, for the first time, submitted a formal transfer request application on behalf of NYU. (See id. ¶ 257.) The application certified that NYU would be the grantee of the Grant and that Plaintiff would be a "regular NYU employee." (See id. ¶ 258.) On October 12, 2007, DeCoster sent NYU an email, with a copy to Kvochak, requesting additional information relating to Plaintiff's appointment at NYU. (See id. ¶ 259.) NYU responded to the request on November 16, 2007. (See id. ¶¶ 273-74.)

Plaintiff characterizes Defendants' communication with NYU as taking the form of "interrogating and auditing style emails" confected to suggest that "the NS-Grant and Plaintiff were being monitored and were under suspicion and surveillance by NIH officials audit and legal authorities." (See id. ¶ 21(f)(ii).) Plaintiff claims that the purpose of such conduct was to tarnish Plaintiff and to dissuade NYU from taking the reins as grantee.

Nonetheless, on November 26, 2007, NINDS did issue an NGA transferring the Grant, in the amount of $124,706, to NYU. (See

id. ¶¶ 277, 279.)   Plaintiff claims that the NGA was never
emailed to NYU.  Consequently, on January 9, 2008, NINDS emailed
a revised NGA to NYU, identical to the previous NGA except for a
change of date. (See id. ¶¶ 289, 292.)  On February 8, 2008,
however, Hodges questioned the amount of the Grant award, since
it was $78,425 below the amount requested in the NYU transfer
application. (See id. ¶ 293.)   DeCoster told Hodges that the
amount of the Grant award was based on the Grant funds
relinquished by the College.  What is more, DeCoster stated that
NINDS had "not received any revisions since the grant was
awarded to [NYU]."   (See id. ¶ 294.)   From this exchange,
Plaintiff concludes that Defendants "refus[ed] NYU's request
that the proper funding for the NS-Grant[,] the missing $78,425
that was misappropriated by Defendants[,] be restored."   (See
id.  ¶ 21(f)(ii).)

     According to Plaintiff, "it became clear to NYU officials
the DER/NINDS had some shady agenda with regard to [Plaintiff]
and her NS-Grant, and they did not want to get involved
anymore."   (See id. ¶ 295.)   On March 7, 2008, NYU faculty
official, Dr. Chiya Aoki, informed Plaintiff of her intention to
"divorce NYU from the NS-Grant and the associated NINDS staff."
(See id.)   Thus, on March 19, 2008, Hodges emailed DeCoster
stating that NYU no longer wished to accept the Grant, and

inquired how to return the Grant to NIH.  (See id. ¶ 297.)  On April 18, 2008, NINDS issued a second revised NGA to NYU, reflecting an increase in the Grant funds in the amount of $78,425, bringing the total award to $203,133 — the amount NYU originally requested. (See id. ¶¶ 298, 340.)

According to Plaintiff, "DeCoster was finally forced to return the embezzled funds five months after knowingly misappropriating the funds and lying to NYU officials with the support of Defendant Kvochak."  (See id. ¶ 298.)  Further, Plaintiff claims that the "embezzled" $78,425 was only restored to the Grant award following NYU's communication to DeCoster that it intended to withdraw as grantee institution.  Despite the restoration of the funds, however, on April 23, 2008, NYU submitted a letter formally "annulling its role as grantee and returning the entire [Grant] award back to the NIH."  (See id. ¶ 299.)

F.   Plaintiff's Privacy Act Requests

1.   Requests to Amend the Record

Plaintiff filed five requests under the Privacy Act to amend the Grant record.  These occurred on November 27, 2007, March 19, 2008, March 31, 2008, April 11, 2008, and, July 1, 2008.  (See id. ¶ 310.)

All of Plaintiff's requests asked NINDS to issue letters or

23

declarations stating the documents relating to the Grant were
"false and fraudulent." (See id. ¶¶ 323, 328-29, 332, 336-38,
344-46.) According to Plaintiff, Defendants issued five NGAs
containing "false information" regarding the Grant history.
Plaintiff alleges that on November 26, 2007, January 9, 2008,
and April 18, 2008, NINDS issued NGAs containing the "false
assertion that [Plaintiff] since March, 2006 [sic] had abandoned
her research project." (See id. ¶ 21(g).)[9]

Plaintiff mischaracterizes the contents of the NGAs. After
the College terminated Plaintiff, NINDS issued a total of four
NGAs. Three of the four NGAs (dated November 26, 2007, January
9, 2008, and April 18, 2008) make no reference whatsoever to
Plaintiff's departure from the College, whether through
abandonment, resignation, or otherwise. Rather, they state that
the award "reflects an approved change of [grantee]
institution," and that the grant comes from "funds released by
the transfer of this award from [the College]." (See
Declaration of Tijuanna DeCoster ("DeCoster Decl."), Ex. N at 3;
id. Ex. P at 3; id. Ex. Q at 3.) The fourth NGA, issued shortly
after Plaintiff's termination by the College, does not state
that Plaintiff abandoned or resigned her position. Rather, it

---

[9] The Complaint provides incorrect dates for the January 2008 and
April 2008 NGAs. (See Compl. ¶¶ 21(g).)

states that the Grant was terminated "due to a change of grantee institution." (See id. Ex. G at 4.)

The first four of Plaintiff's Privacy Act requests were made before NYU officially relinquished the Grant on April 23, 2008. The April 11, 2008 request demanded that (i) NINDS issue a new NGA reflecting the Grant's true balance as $203,132, and (ii) that the new NGA state that the Grant was being transferred from Sloan Kettering to NYU, without mention of the College, which, according to Plaintiff, was terminated for cause. (See id. ¶ 338.) NINDS responded to the April 11, 2008 request by issuing a revised NGA, on April 18, 2008, that identified $203,133 as the available Grant balance. (See id. ¶ 339.) NINDS did not make any of the other amendments that Plaintiff requested. (See id. ¶¶ 325, 330, 334, 339, 347.)

Plaintiff concludes that Defendants "engaged in illegal conduct to conceal their wrongdoing" (see id. ¶ 21(e)), by refusing her requests for desired amendments to the Grant record, issuing NGAs that adopted the "false" version of events, and avoiding communication with her. (See id.)

### 2.   Requests to Access Records

On March 24, 2008 Plaintiff submitted a request under the Privacy Act to access all records pertaining to the Grant from May 1, 2005 onwards, including all internal email communications

relating to the Grant from January 1, 2005 onwards.  (See id. ¶¶ 349, 354.)   On July 8, 2008, Plá sent certain documents to Plaintiff in response to her request, which Plaintiff argues were deficient.  (See id. ¶¶ 355, 359.)

### DISCUSSION

Based on this factual account, Plaintiff brings eight causes of action, alleging violations of (i) the Fifth Amendment Due Process Clause, (ii) the First Amendment, (iii) 42 U.S.C. § 1985(2), (iv) 42 U.S.C. § 1986, and (v) four violations of the Privacy Act.  Defendants argue that all of Plaintiff's claims should be dismissed for failure to state a claim upon which relief can be granted.   In the alternative, Defendants seek summary judgment on Plaintiff's four Privacy Act claims. Plaintiff cross-moves for summary judgment on the eighth claim under the Privacy Act.

I.   Rule 12(b)(6) Arguments

A.   Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), this Court must accept all well-pleaded allegations contained in the Complaint as true, and must draw all reasonable inferences in favor of Plaintiff.   See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 1965 (2007).  A plaintiff need not include "heightened fact pleading of specifics" to survive a

Rule 12(b)(6) motion, id. at 570, 127 S. Ct. at 1974, but the "[f]actual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." Id. at 555, 127 S. Ct. at 1965 (citation omitted). Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009).

Ultimately, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. at 1974. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. In contrast, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557, 127 S. Ct. at 1966) (citations omitted). Thus, if a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." Twombly, 550 U.S. at 570, 127 S. Ct. at 1973.

Finally, "[o]n a motion to dismiss, the court may consider 'any written instrument attached to [the complaint] as an exhibit or any statement or documents incorporated in it by reference.'" Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001) (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991)); see also Fed. R. Civ. P. 10(c) ("Statements in a pleading may be adopted by reference in a different part of the same pleading or in any motion.  A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

"Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. AT&T Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam); accord Sira v. Morton, 380 F.3d 57, 62 (2d Cir. 2004). In other words, a court may consider "documents that the plaintiff[] either possessed or knew about and upon which [she] relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (citing Cortec, 949 F.2d at 47-48); see also Brass v. Am. Film Tech., Inc., 987 F.2d 142, 150 (2d Cir. 1993). Similarly, as discussed supra at note 7, the Court may

take judicial notice of applicable federal regulations.

II.  Plaintiff's Fifth Amendment Due Process Claims

Plaintiff alleges that the Individual Defendants violated Plaintiff's Fifth Amendment rights by depriving her of property and liberty without due process of law, when they (i) terminated her research project through (a) the "fraudulent payment" of Grant funds to the College, (b) the "illegal withdrawal" of Grant funds, and (c) the "illegal embargo" and obstruction of her grant transfer application; (ii) accused her of research misconduct; and (iii) destroyed her future employment prospects. (See, e.g., Compl. ¶¶ 21(a),(c)(i), 217, 371-72.)

Defendants argue that Plaintiff's due process claims fail as a matter of law because (i) Plaintiff does not have a constitutionally protected property interest in the Grant or her PI position; (ii) on its face, the Complaint (along with the documents it incorporates) does not support Plaintiff's allegations; and (iii) Plaintiff has failed to sufficiently allege a "stigma plus" claim that implicates a protected liberty interest.  (See Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Complaint and For Summary Judgment, dated June 15, 2009 ("Defs.' Mem."), at 12.)

A. Plaintiff Fails to Allege Deprivation of a Property Interest

Plaintiff claims that Defendants violated her constitutionally protected property interest in the Grant. She contends that she has a property interest because (i) "her entire salary and appointment at the College depended on and were inextricably connected to the NS-Grant[,]" (ii) the Grant "expressly provided for the payment of [Plaintiff's] salary," (iii) Plaintiff signed the Grant, and (iv) the Grant required her signature.

### 1. The Alleged Property Interest

"To survive a motion to dismiss, a due process claim . . . must allege the deprivation of a constitutionally protected interest." Abramson v. Pataki, 278 F.3d 93, 99 (2d Cir. 2002). To have a protectable property interest in a particular benefit, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972); accord Abramson, 278 F.3d at 99.

A property interest is not created in the Constitution, but is "defined by existing rules or understandings that stem from an independent source such as state law." Roth, 408 U.S. at 577, 92 S. Ct. at 2709. Statutory or contractual provisions, however, are not a prerequisite for a legitimate claim of

entitlement.  "A person's interest in a benefit is a 'property' interest for due process purposes if there are . . . rules or mutually explicit understandings that support his claim of entitlement . . . ."  Perry v. Sinderman, 408 U.S. 593, 601, 92 S. Ct. 2694, 2699 (1972).  Thus, for example, a public employee does not have a property interest in his continued employment unless there is a "contractual or statutory provision guaranteeing continued employment absent sufficient cause for discharge or he can prove a de facto system of tenure." Abramson, 278 F.3d at 99.

That Plaintiff had certain responsibilities under the Grant, and received her salary from the College through the Grant, does not give her an entitlement to the Grant.  Plaintiff can point to no independent source such as a statute or regulation that bestows on her a direct entitlement to the Grant.  See Pueblo v. Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health and Human Servs., 720 F.2d 622, 655 (10th Cir. 1983) (declining to recognize property interest in community organization's receipt of federal funding because there existed no statutory entitlement to the funding); see also Martz v. Inc. Vill. of Valley Stream, 22 F.3d 26, 30 (2d Cir. 1994) (when determining whether a plaintiff has a claim of entitlement for purposes of having a property interest protected by due process,

courts focus on the applicable statute, contract or regulation) (citing <u>Kelly Kare, Ltd. v. O'Rourke</u>, 930 F.2d 170, 175 (2d Cir. 1991)). Indeed, Plaintiff concedes that the "grant award is entrusted to the sponsoring institution" rather than the PI. And, it is the grantee institution, not the PI, that enjoys "the sole power of drawing down the grant's funds." (<u>See</u> Compl. ¶ 28.)

That a PI does not have a property interest in a grant is made clear by the governing regulations and the limited relevant caselaw that exists. It is the grantee institution (the College), and not the PI, that is the legal recipient of the grant. <u>See</u> <u>Abbs v. Sullivan</u>, 756 F. Supp. 1172, 1184 (W.D. Wis. 1990), <u>vacated on jurisdictional grounds</u>, 963 F.2d 918 (7th Cir. 1992) (finding PI had no property interest in NIH grant because PI was not the recipient of the grant); <u>Thermogen, Inc. v. Chou</u>, No. 98 CV 01230 (SBC), 1998 WL 246395, at *2 (N.D. Ill. Apr. 30, 1998) ("A grant may be understood as a contract between the granting agency . . . and the grantee or recipient [institution]."); <u>Pemrick v. Stracher</u>, No. 92 CV 959 (CLP) 2007 WL 1876504, at *10-11 (E.D.N.Y. 2007) (denying PI's possessory claim to equipment bought with grant funds because research institution, and not the PI, was the "grantee" or "recipient"); <u>see also</u> 42 C.F.R. § 52.2 (stating that the "grantee" is "the

32

responsible legal entity to whom a grant is awarded," whereas
the PI is "responsible for the scientific and technical
direction of the [grant-funded] project"); 45 C.F.R. § 74.1
(conveying that HHS grants are "awarded to institutions of
higher education, hospitals, other nonprofit organizations and
only to commercial organizations [under certain
circumstances]"). Moreover, an NIH grant need not follow the PI
in the event of a breakdown in the PI-grantee employment
relationship. The grantee may replace the PI, with prior
approval of the awarding agency. See 45 C.F.R. § 92.30(d)(3);
see also Weathers v. Univ. of N.C., No. 1:08CV847 (WLO), 2008 WL
5110952, at *2 (M.D.N.C. Dec. 4, 2008) (grantee institution
permitted to designate a substitute PI).

In addition, NIH may terminate a grant with the consent of
the grantee institution, without any requirement of PI input.
See 45 C.F.R. § 74.61(a)(2). Indeed, NIH has the express
authority to discontinue a grant at any time. See 45 C.F.R. §
74.61(a)(1); NIHGPS, at 37; see also Town of Castle Rock Colo.
v. Gonzales, 545 U.S. 748, 756, 125 S. Ct. 2796, 2803 (2005)
("Our cases recognize that a benefit is not a protected
entitlement if government officials may grant or deny it in
their discretion."); Seymour's Boatyard, Inc. v. Town of
Huntington, No. 08 Civ. 3248 (JG)(AKT), 2009 WL 1514610, at *4-6

33

(E.D.N.Y. June 1, 2009) (contractor lacked property interest in a license awarded by town where (i) no state law created entitlement to the benefits of contract with the state, and (ii) it was within town board's discretion to rescind resolutions and to decide not to award contract to winning bidder); Empire Transit Mix, Inc. v. Guiliani, 37 F. Supp. 2d 331, 335-36 (S.D.N.Y. 1999) ("Where an administrative body maintains 'significant discretion over the continued conferral of a benefit, it will be the rare case that the recipient will be able to establish an entitlement to that benefit.'" (quoting Kelly Kare, 930 F.2d at 175)).

Further, in relation to NIH, Plaintiff also had no legal right to maintaining her position as PI. See Needleman v. Healy, No. Civ.A. 92-749, 1996 WL 33491149, at 4 n.1 (W.D. Pa. May 22, 1996) ("[P]laintiff has no constitutionally protected property interest in continuing to serve as principal investigator on his research grants from the National Institute of Environmental Health Sciences."). A PI holds a non-governmental job at the grantee institution. Here, Plaintiff acknowledges that she was an employee of the College and then NYU, and not an NIH employee. (See Compl. ¶¶ 57, 81-83, 258.; see also NIHGPS, at 18 (identifying a PI as a part of the grantee organization's staff).)

Nor may Plaintiff argue that she was the intended beneficiary of the Grant.  As the Complaint notes (see Compl. ¶¶ 2-3), the public at large is the intended beneficiary of NIH research.  See Abbs, 756 F. Supp. at 1183 (NIH research grants "are not made for [the PI's] benefit, but for the benefit of the public that may enjoy the fruits of his research").

Although there is limited caselaw on the subject, the one case that is directly on point supports Defendants' position.  In Abbs, the plaintiff, a professor at a state university and the PI on an NIH grant, brought suit against NIH and several HHS employees, alleging, inter alia, that the defendants violated his due process rights by announcing an investigation of the plaintiff for scientific misconduct.  The plaintiff claimed a direct property interest in the grant because of the "interrelationship of federal funding with his career advancement and income."  Abbs, 756 F. Supp. at 1182.  The district court rejected the plaintiff's claim, determining that despite the importance of NIH grant funding to the plaintiff, "it does not constitute a constitutionally protected property interest unless his claim to it is legally enforceable by contract or federal law."  Id.  The court reasoned that because the university, and not the plaintiff, was the grantee, pursuant to 45 C.F.R. Part 74, the plaintiff "[could] claim no property

35

rights in the funding for these grants." Id. Further, the court noted that "as to future funding, [plaintiff] has no enforceable right to receive grants or awards [because] such funding is discretionary with the funding agency." Id.

Plaintiff points to one case in support of her position, where, under different circumstances, a court found that a PI did have a constitutionally protected property interest in his PI status on a federal research grant. See Hamid v. John Jay Coll. of Crim. Justice, No. 99 Civ. 8669 (WK), 2000 WL 666344 (S.D.N.Y. May 19, 2000). That case, however, is quite distinguishable.

In Hamid, the plaintiff, a tenured professor, sued his employer, a state university, and affiliated university employees, for removing and replacing him as PI on two federally funded research projects. The district court found that the plaintiff had sufficiently alleged a property interest in his PI status to survive a motion to dismiss. In reaching this conclusion, the court emphasized that "the scope of academic interests evoking procedural due process requirements reaches well beyond the core protection of tenured positions." Id. at *5. Included in a tenured professor's rights is "the right to pursue scholarship," and "the right to guide a research project and receive funding therefore constitutes an integral part of

social science scholarship." Id. at *6. In addition, with the loss of his PI status, the plaintiff suffered a loss of compensation from the college. The court was therefore prepared to allow the plaintiff "the chance to show that the College fostered a custom and mutual understanding that its faculty and administration would not interfere with a tenured professor's research." Id.; see also id. (increase in compensation of plaintiff as a result of PI position, combined with "'tenure right' to unimpeded research . . . (if proven) constitutes a substantive rule of entitlement independent of [plaintiff's] source of funding").

Hamid provides little in the way of support for Plaintiff's position. The court did not conclude that the plaintiff had a property interest in his grant vis-à-vis NIH; rather, the court found that he might have a property interest in his PI status vis-à-vis his employer, a college, because custom and practice might show that his tenure rights as a professor might include an unfettered right to conduct research. Here, Plaintiff brings suit against the awarding government agency — NINDS — plus affiliated employees, claiming a property interest in the Grant. Plaintiff concedes, however, that she has no employment relationship with NINDS. And, the governing regulations make

37

clear that she has no right to the funds in the Grant, which was awarded to the College.

Plaintiff cannot premise a claim of entitlement to the Grant on allegations that the Grant required her signature and that she held certain responsibilities relating to the College's use of Grant funds. (See Compl. ¶¶ 23-38.) Plaintiff's responsibilities under the Grant did not give rise to a mutual explicit understanding that Plaintiff had an entitlement to the Grant.[10]  In fact, under the terms and conditions of the NGA, it was the College's relationship to NINDS and its Grant that was highly regulated, and not NINDS's relationship with the PI.  See Abbs, 756 F. Supp. at 1180 (finding that grantee is the "entity with the legal and financial responsibilities for the NIH funds"); Thermogen, 1998 WL 246395, at *3 (a PI does not obtain significant legal rights and obligations through grant, and is not subject to same extensive regulatory conditions as the

---

[10] Plaintiff grossly overstates the significance of her oversight responsibilities. (See Compl. ¶¶ 23-38; Pl.'s Mem. at 16.)  The NIH Policy Manual, referenced in her brief, however, simply states, in pertinent part, that "the principal investigator agrees to accept fiscal responsibility, as well as responsibility for the scientific conduct of the project, and to provide the required progress reports if a grant is awarded . . . ."  Further, "the PI also undertakes a fiscal management obligation to the grantee . . . to expend grant funds for the purposes set forth in the [Grant] application and the [NGA]." (See Declaration of Nurit Kalderon, dated July 24, 2009 ("Kalderon Decl."), ¶¶ 26-27.)

grantee institution).   Indeed, in initiating a whistleblower action under the FCA against the College, which was brought on behalf of the government, Plaintiff implicitly recognized that it was NIH, rather than Plaintiff, that had a property interest in the funds in the Grant.

In short, although Plaintiff undeniably had a personal and professional interest in the Grant, the governing regulations make clear that she had no right to the Grant, and they placed complete discretion over the Grant and its continuation in NINDS, the funding source under these circumstances.   As such, Plaintiff has articulated nothing more than "a unilateral expectation of continued federal funding for research, which . . . does not give rise to a constitutionally protected property interest."  Abbs, 756 F. Supp. at 1183.

### 2.   The Alleged Deprivation

Leaving aside the question of Plaintiff's putative property interest, Plaintiff also fails to allege any plausible deprivation of either the Grant or her PI status.   Plaintiff asserts, "she lost both her actual current funding and her ability to compete for future government grants."  (See Pl.'s Mem. at 16.)   Specifically, she contends that Defendants deprived her of her property interest through an "illegal withdrawal" of $78,427 from the Grant, in the period between

when the College relinquished the Grant and the Grant was transferred, on Plaintiff's request, to NYU. (See Pl.'s Mem. at 10.) By regulation, however, the agency is authorized to take interim enforcement action, such as withholding grant funds and suspending access, without any requirement of PI approval. See 45 C.F.R. § 74.62. Moreover, at the time that the funds were "withdrawn" or unavailable, Plaintiff was not even employed by a grantee institution and, thus, could not make use of them. In this respect, Plaintiff's reliance on Hamid is misguided. There, the focus was on an employer's determination that unequivocally removed a PI from his position, with the concomitant loss of funding and income. Even the Hamid court recognized that when a Plaintiff PI challenges interim actions, even aimed at him during the course of an investigation (as in Abbs), the PI's due process rights are not necessarily triggered.

Moreover, Plaintiff cannot plausibly establish a deprivation of property through her allegation that Defendants unlawfully terminated the research project. The Complaint acknowledges that it was the College that terminated Plaintiff's employment, that Plaintiff was permitted to transfer the Grant to NYU, and that it was NYU that relinquished it. And, Plaintiff remained the PI on the Grant, as stated in all of the

NGAs that the Complaint references. NINDS never undertook action directed at Plaintiff, such as an investigation for scientific misconduct, and, as her brief concedes, NINDS never sought or instituted removal proceedings against Plaintiff as PI.[11] (See Pl.'s Mem. at 18.)

Similarly, Plaintiff's alleged loss of ability to compete for future funding does not amount to a plausible deprivation of a protected property interest. First, Plaintiff does not even allege that she has been barred from submitting prospective applications for future grant funding, and she has referenced nothing in the Grant file, which she otherwise liberally cites throughout the Complaint, that does so. In any event, future grant funding is, at best, a unilateral hope, not an entitlement. See Sanitation and Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 995 (2d Cir. 1997) (finding no property interest in prospective application for a license to be issued by state or municipal authority on discretionary basis);

---

[11] Plaintiff also argues that she was de facto removed as PI because NINDS staff communicated directly with College officials, rather than through her. The alleged lack of communication, however, does not implicate a property interest. NINDS had no obligation to filter its communications with the grantee institution through Plaintiff, particularly after the College terminated Plaintiff's PI status. Moreover, once Plaintiff found a new grantee institution to sponsor her work, she continued to be named as the PI, and the Grant was transferred to NYU.

DeJournett v. Block, 799 F.2d 430, 431 (8th Cir. 1986) ("The fact that [applicants for federally funded farmers' loans] have received [federal] loans in the past does not in and of itself provide the [applicants] with a constitutionally protected interest in future [federal] loans.").

For the foregoing reasons, therefore, the Complaint fails to allege the deprivation of a constitutionally protected property interest.

B.    Plaintiff's Alleged Deprivation of a Liberty Interest

Liberally construing the Complaint, Plaintiff claims that Defendants deprived her of a constitutionally protected liberty interest without due process by accusing her of research misconduct.[12] (See Pl.'s Mem. at 16-17.)    As a result, she alleges that she "now is unemployed, unemployable, and deprived of her intellectual property." (See Compl. ¶ 300.)

To implicate a protected liberty interest, Plaintiff must plead a "stigma plus" claim. See Siegert v. Gilley, 500 U.S. 226, 234, 111 S. Ct. 1789, 1794 (1991) (absent the allegation of a "plus" factor, the Due Process Clause does not protect a person's interest in her good reputation and related freedom to

---

[12] This is not the precise basis of Plaintiff's claim as set forth in the Complaint. (See Compl. ¶¶ 370-72.)  As with all of Plaintiff's claims, it is difficult to discern exactly what their basis is, as the Complaint overflows with a flood of alleged facts, many of which are inconsistent.

pursue future employment). To plead a stigma plus claim, Plaintiff must allege "(1) the utterance of a statement about her that is injurious to her reputation, that is capable of being proved false, and that he or she claims is false, and (2) some tangible and material state-imposed burden . . . in addition to the stigmatizing statement." *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) (internal quotation marks omitted); accord *Abramson*, 278 F.3d at 101; *O'Neill v. City of Auburn*, 23 F.3d 685, 691 n.2 (2d Cir. 1994) ("Simple damage to reputation does not give rise to a liberty interest claim; rather, the damage must be accompanied by some significant deprivation, such as dismissal from government employment.").

### 1. The Alleged Stigma

A defamatory statement will satisfy the "stigma" requirement. See *Velez*, 401 F.3d at 89 (liberty interest implicated "[w]hen government actors defame a person and . . . deprive them of some tangible legal right or status"). Here, however, Plaintiff fails to allege sufficient facts to satisfy the stigma element.

Plaintiff identifies Defendants' stigmatizing statements as (i) an internal email concerning the Grant, dated June 28, 2006, in which Myrbeck "false[ly]" stated that Plaintiff "was fired by the awardee organization for never showing up for work" (see

Compl. ¶¶ 152-157); and (ii) several NGAs, issued by Defendant NINDS, containing "the false assertion that [Plaintiff] since March, 2006 [sic] had abandoned her research project." (See id. ¶ 21(g).)   Plaintiff alleges that these statements are defamatory because they constitute "a very serious charge of misconduct," implying that she "had violated both her scientific and financial responsibilities to the [Grant] as PI, and committed financial fraud." (See Pl.'s Mem. at 18.)

As to the first remark, it is not plausible that the internal email in which Myrbeck stated "[Plaintiff] was fired by the awardee organization for never showing up for work" is a defamatory stigmatizing statement.   To qualify, "the defamatory statement must be sufficiently public to create or threaten a stigma." Velez, 401 F.3d at 87; see also Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 631-32 (2d Cir. 1996) ("Stigmatizing statements by the government about an employee upon her discharge only implicate a liberty interest when there is a public disclosure."); White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1063 (2d Cir. 1993) ("Recovery is limited to those instances where the stigmatizing charges made in the course of discharge have been or are likely to be disseminated widely enough to damage the discharged employee's standing in the community or to foreclose future job

opportunities."). While a stigmatizing statement in a discharged employee's personnel file could be sufficient, where it is "likely to be disclosed to prospective employers," Donato, 96 F.3d at 631, here, Myrbeck made the statement in an internal agency email to a limited number of NINDS employees. There is no basis to conclude that a statement in an internal email, which was not placed in any personnel file relating to Plaintiff (who was not a NINDS employee), constitutes a public disclosure. See Brevot v. New York City Dep't of Educ., 299 F. App'x 19, 21 (2d Cir. 2008) ("letter does not meet this publication requirement because it was an internal document circulated only within the Department [of Education]").

Moreover, the remark was not false and, therefore, cannot be defamatory. Myrbeck was simply stating what the College reported to NINDS about its termination of Plaintiff, a College employee. Although Plaintiff contends that the College was the wrongdoer, and that there were valid reasons for her not commencing work on the Grant when it was transferred to the College, it remains the fact that the College fired her because it perceived her as not reporting to work. Indeed, the Complaint cites a communication from the College to NINDS, stating:

> [T]he principal investigator has refused to
> begin research at this facility (in
> laboratories constructed to her
> specifications), allegedly finding numerous
> problems with the lab set up. . . . It has
> become clear to us that we cannot properly
> discharge our oversight responsibilities . .
> . because the principal investigator has not
> reported to work. . . .

(See Compl. ¶ 87.)

Having concluded that the first alleged stigmatizing remark was not publicly disseminated and was not false, there is no need to go further.

In any event, not every derogatory statement implicates a liberty interest. A stigmatizing statement must go to the heart of an employee's professional competence, threaten to damage her professional reputation, and significantly impair her ability to practice her profession. See O'Neill, 23 F.3d at 691-92 (finding that public statements in newspaper that plaintiff was not "up to par" and "sloppy" were not sufficiently stigmatizing to implicate liberty interest). "In most cases a state employer's criticism will not be so stigmatizing as to foreclose the employee's freedom to seek employment." Donato, 96 F.3d at 622. A failure to report to work says little about an employee's competence as a scientist, is less stigmatizing than even a vague statement of incompetence, which the Second Circuit

has concluded does not implicate a liberty interest, see Donato,
96 F.3d at 630-31, and clearly does not rise to level of "a bill
of indictment, methodically reciting a litany of lack of
professional competence." Id. at 631. See also Storman v.
Klein, No. 09 Civ. 0338 (SHS)(AJP), 2009 WL 1035964, at *14
(S.D.N.Y. Apr. 20, 2009) ("[S]tatement[s] that an employee
poorly performed her duties or acted in an improper manner, or
that describe behavior or actions that are within the employee's
power to correct, do not generally qualify as stigma for
constitutional purposes.") (citing Russell v. Hodges, 470 F.2d
212, 217 (2d Cir. 1972)); Schlesinger v. New York City Trans.
Auth., No. 00 CV 4759 (SAS), 2001 WL 62868, at *7 (S.D.N.Y. Jan.
24, 2001) (statement that plaintiff acted unprofessionally not
stigmatizing; statement did not reflect dishonesty or
immorality, beyond plaintiff's power to correct). The Court
does not accept as plausible Plaintiff's fanciful inference
that, among other things, the Myrbeck remark implies that
Plaintiff had "committed financial fraud." (See Pl.'s Mem. at
18.)[13]

Turning to the purported statements in the NGAs, Plaintiff
contends that that these documents falsely stated that she had

---

[13] It bears noting that notwithstanding the alleged defamatory
statement, NINDS did not remove Plaintiff as the PI on the Grant
and agreed to transfer the Grant to NYU.

"abandoned" her research, and were designed to "kill Kalderon['s] professional reputation and livelihood." (See Compl. ¶ 21(g).) This, however, is not an accurate characterization of those documents that the Court must accept as true. As discussed supra at pages 23-25, the NGAs say nothing of the sort. Indeed, Plaintiff concedes that the NGAs were stigmatizing not for any statement therein, but because they "incorporated by reference, a false relinquishing statement, submitted by the College, which states that that [Plaintiff] resigned." (See Pl.'s Mem. at 22.) A putative statement, however, about Plaintiff resigning her position, contained in a document made by a third-party (the College), and not even in the NGAs, cannot be a stigmatizing remark attributable to Defendants. Nor is it plausible on its face to say that the remark "Plaintiff resigned" from her position was so stigmatizing as to seriously injure Plaintiff's prospects of future employment. If anything, the statement casts her in a more positive light than a statement that she was terminated from her position, which is, in fact, what occurred.

    2.  The Alleged "Plus" Factor

    Leaving aside her failure to allege a stigmatizing statement attributable to Defendants, Plaintiff also fails to allege the requisite "plus" factor.

Plaintiff claims that a "plus" is shown by "(i) termination of the [Grant] and the illegal withdrawal of the remaining funds; (ii) an embargo on the transfer of the NS-Grant and further obstruction of the transfer of the [Grant] to NYU; (iii) termination of [Plaintiff] as PI on the Grant; and (iv) Defendant's failure to institute, in accordance with NIH's rules, a replacement grant." (Pl.'s Mem. at 17-18; see also Compl. ¶ 372.)

The first three assertions, none of which is plausible, simply rehash arguments which the Court has already rejected in its property interest analysis. As discussed, NINDS never terminated the Grant, and, in fact, NINDS allowed Plaintiff to remain PI, never implementing procedures to remove her as PI. Indeed, she was named as PI on each NGA. What is more, NINDS authorized the transfer of the Grant to NYU. All of these facts are reflected in the documents referenced in the Complaint, to which Plaintiff has had access. In any event, a delay in transferring the Grant to NYU, and a failure to respond to Plaintiff's emails, do not implicate a liberty interest.[14] Substantially more is necessary to show the alteration of some legal right or status, sufficient to satisfy the plus element of a stigma plus claim. See, e.g., Patterson v. City of Utica, 370

---

[14] NYU had to first formally request the transfer and employ

F.3d 322, 332 (2d Cir. 2004) (individual who was terminated for
two weeks and then reinstated in prior position could not show
significant alteration of his employment status sufficient to
meet the "plus" requirement); Dobosz v. Walsh, 892 F.2d 1135,
1140 (2d Cir. 1989) (five-month suspension of police officer not
sufficient to show "plus" factor, when he was reinstated with
back pay); Martinez v. City of New York, No. 00 Civ. 7914 (WHP),
2003 WL 2006619, at *8 (S.D.N.Y. Apr. 30, 2003) ("plus" prong
not met where police officer was transferred to another
precinct); accord Maples v. Martin, 858 F.2d 1546, 1551 n.5
(11th Cir. 1988) (holding that transfer of university professors
between departments, without loss of rank or pay, did not
implicate professors' liberty interest); see also Boss v. Kelly,
306 F. App'x 649, 651 (2d Cir. 2009) (negative impact on police
officer's job prospects following police commissioner's wholly
discretionary decision to withdraw certain privileges did not
alter a legal right or status, where officer's employment was
not terminated; carrying a gun was not a necessary component of
being a police officer); Abramson, 278 F.3d at 103 (denying
stigma plus claim where plaintiffs "were not terminated from
government jobs"); Brandt v. Bd of Coop. Educ. Servs., 820 F.2d
41, 43 (2d Cir. 1987) (liberty interest implicated when public

---

Plaintiff in order for Plaintiff to access the Grant.

governmental charges <u>accompanying dismissal</u> impose stigma that impairs opportunity to obtain other employment); <u>La Forgia v. Davis</u>, No. 01 Civ. 7599 (GBD) (LMS), 2004 WL 2884524, at *8-9 (S.D.N.Y. Dec. 14, 2004) (plaintiff failed to establish stigma plus claim where defamation did not take place in course of plaintiff's <u>termination</u>).

As to the fourth asserted "plus" element — Defendants alleged failure to institute a replacement grant — Plaintiff is mistaken in asserting that the rules required a replacement. The NIH Policy Manual provides:

> When a grant is terminated either by mutual consent or unilaterally by the grantee, the awarding unit should request a written statement from the original grantee relinquishing its interests and rights to the grant.
>
> An [NIH awarding unit] may terminate a grant unilaterally . . . for failure of a grantee to comply with terms and conditions of the grant. In this case, the NIH awarding unit would not consider a replacement principal investigator. If the grantee will not provide a written statement relinquishing interest and rights to the original grant, no action may be taken by the NIH affecting the original grant until the original grantee institution has exhausted or forfeited its appeals rights. However, <u>a limited replacement grant may be awarded to a replacement institution</u> using funds out of the current year appropriation, while the original grantee is appealing the grant termination action.

NIH Policy Manual, Chapter 55201, Section E, Subsection d.

Finally, a vague claim as to the possibility of lost future employment is simply inadequate to satisfy the "plus" element. See O'Neill, 23 F.3d at 694 (vague statements published in newspaper that did not specify why plaintiff was reportedly "incompetent" in his job, did not impugn plaintiff's professional reputation or impair his ability to find future employment); Abramson, 278 F.3d at 101 (plaintiffs' loss of future opportunity to work at Javits Center not protected by Constitution).

* * * *

Because the Complaint fails to allege the deprivation of a constitutionally protected property or liberty interest, the Court recommends that Plaintiff's Fifth Amendment due process claim be dismissed for failure to state a claim for relief.

III. Plaintiff's First Amendment Retaliation Claim

Plaintiff contends that the Individual Defendants violated her First Amendment rights by retaliating against her for complaining about mismanagement of the Grant. (See Compl. ¶¶ 377-81.) Plaintiff identifies her protected speech as speech relating to "the misuse and mishandling of federal funds allocated for life-saving." (See Pl.'s Mem. at 19.) Defendants move to dismiss for failure to state a claim for relief, arguing

that Plaintiff's complaints about mishandling of the Grant do not constitute a matter of public concern. (See Defs.' Mem. at 18.)   In opposition, Plaintiff contends that her speech about the "financial improprieties and abuse of federal funds" was that of a private citizen "plainly related to a matter of public concern." (See Pl.'s Mem. at 18-19.)

The First Amendment prohibits government officials from subjecting an individual to retaliatory actions in response to protected speech. See Hartman v. Moore, 547 U.S. 250, 256, 126 S. Ct. 1695, 1701 (2006).   To state a claim for First Amendment retaliation, a plaintiff must allege (i) that she engaged in speech or conduct that was constitutionally protected, (ii) that defendants took adverse action against the plaintiff causing her harm, and (iii) that there was a causal connection between the protected speech and the adverse action.   See Gronowski v. Spencer, 424 F.3d 285, 292 (2d Cir. 2005); Gill v. Pidlypchak, 389 F.3d 379, 384 (2d Cir. 2004); Morris v. Landau, 196 F.3d 102, 110 (2d Cir. 1999). Speech is protected if it relates to a matter of public concern.   Speech is not about a matter of public concern if a plaintiff speaks pursuant to her official duties rather than as a private citizen.   See Garcetti v. Ceballos, 547 U.S. 410, 421, 126 S. Ct. 1951, 1960 (2006); see also Weintraub v. Bd. of Educ., 593 F.3d 196, 201 (2d Cir. 2010)

(where plaintiff filed a union grievance about supervisor's failure to discipline a child, he did not speak as a citizen because he was speaking pursuant to his official duties); Sousa v. Roque, 578 F.3d 164, 174 (2d Cir. 2009) (speech on an employee's dissatisfaction with the conditions of his employment does not pertain to matters of public concern); Renken v. Gregory, 541 F.3d 769, 773-74 (7th Cir. 2008) (professor speaking about difficulties of grant administration and funds misuse was not speaking as a citizen because these were part of his duties in administering a grant as a PI).

Here, Plaintiff was the PI on a federally funded grant and was subject to federally defined obligations. Plaintiff concedes that when she spoke out about the alleged mishandling of the Grant she did so pursuant to her obligations as PI. "As part of the Principal Investigator [sic] duties/obligations, the College's fraud was repeatedly communicated to Defendants by [Plaintiff]." (See Compl. ¶ 20.)   Further, Plaintiff acknowledges that "[t]he PI has a dual role: monitoring the performance of the research project and also monitoring the grantee's compliance with respect to the grant's funds and available facilities." (See id. ¶ 30.) Likewise, according to Plaintiff, "[t]he PI, according to NIH regulations has the primary focal role of monitoring the grantee institution's

54

management of the [Grant] . . . [T]he primary 'work' of the PI is to monitor the [grantee] institution's compliance with regard to the availability of research facilities and the management of the grant." (See id. ¶ 18.)

Although Plaintiff was privately employed by the College, it is clear that her complaints about mismanagement of the Grant were made pursuant to her official duties in relation to an NIH grant. As a result, her statements "have no analogue to citizen speech," and, thus, are not protected by the First Amendment. Weintraub, 593 F.3d at 201-02 (school teacher's filing of grievance was pursuant to his official duties as teacher, and thus, was not protected by the First Amendment); accord Renken, 541 F.3d at 774 (professor's complaints about alleged mishandling of federal grant not protected by First Amendment, because speaking out about the administration of the grant was within his duties as faculty member); see also Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1239, 1204 (10th Cir. 2007) (same for teachers who spoke pursuant to their official duties); Battle v. Bd. of Regents for Ga., 468 F.3d 755, 761 (11th Cir. 2006) (same for university employee's report alleging improprieties in her supervisor's handling of federal financial aid funds).

Moreover, because much of Plaintiff's speech was directed

at the suitability of working conditions at the College and the money that would be available to her for work under the Grant, it does not implicate a matter of public concern. See Lewis v. Cowen, 165 F.3d 154, 164 (2d Cir. 1999) ("speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern"); see also Connick v. Myers, 461 U.S. 138, 147, 103 S. Ct. 1684, 1690 (1983) (defining a "matter of public concern" as one that "relat[es] to any matter of political, social, or other concern to the community").

Since the Complaint clearly fails to satisfy the first prong of a First Amendment claim, the Court need not consider the second or third prong — adverse actions, and the causal relationship between any protected speech and any adverse actions.[15]

---

[15]  Plaintiff's allegations of Defendants' adverse harmful actions — the same arguments used to assert a liberty interest — are implausible. (See Pl.'s Mem. at 17-18.)  NINDS funded Plaintiff's research for over five years, providing her with access to over $2 million dollars.  (See Compl. ¶ 43.)  At the end of the Grant period, with approximately $200,000 remaining, Plaintiff entered into a dispute with the College.  The College, not Defendants, then terminated Plaintiff's employment.  When Plaintiff sought to transfer the Grant to NYU, Defendants accommodated her.  On November 26, 2007, NIH issued an NGA transferring the Grant to NYU.  On April 18, NINDS issued a revised NGA correcting the award amount.  Plaintiff was named in each NGA as the PI on the Grant.  (See Compl. ¶¶ 277, 279, 298, 340.)  NYU however, not Defendants, then decided to relinquish the Grant.

For the reasons provided, Plaintiff's First Amendment claim should be dismissed for failure to state a claim for relief.

IV.   <u>Plaintiff's Civil Rights Claims</u>

A.   <u>42 U.S.C. § 1985(2)</u>

Plaintiff contends that Defendants Kvochak, DeCoster, Davis-Vanlue, and Pancrazio violated her civil rights under 42 U.S.C. § 1985(2).   Plaintiff alleges that Defendants violated § 1985(2) through (i) Kvochak's failure to comply (to Plaintiff's satisfaction) with a non-party subpoena, served in connection with the whistleblower action, and by (ii) "generally interfering with [Plaintiff's] pursuit of her whistleblower lawsuit, by retaliating against her [including] imposition of an embargo on the submission of a grant application for a change of grantee institution."   (<u>See</u> Compl. ¶ 384.)   According to Plaintiff, Defendants' "conspiratorial purpose was the cover-up of financial fraud of the Federal Government, the punishment of a whistleblower, the termination of her research project as well as her employment, and Defendants' cover-up of the illicit behavior."   (<u>See</u> <u>id.</u> ¶ 385.)   Defendants move to dismiss for failure to state a claim for relief.

Section 1985(2) forbids, in pertinent part, "two or more persons . . . [from] conspir[ing] to deter, by force, intimidation, or threat, any party or witness in any court of

the United States from attending such court, . . . or to injure such party or witness in his person or property on account of his having so attended or testified . . . ."   42 U.S.C. § 1985(2).

Plaintiff's allegations fail to state a violation of § 1985(2).   Plaintiff's conspiracy argument turns on a litany of vague and implausible contentions.   Conspiracy claims, however, must be pled with particularity.   Mere conclusory assertions of "general[] interferen[ce]" are not good enough.   See, e.g., Webb v. Goord, 340 F.3d 105, 111 (2d Cir. 2003) ("The plaintiffs have not alleged, except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants.   Their conspiracy allegation must therefore fail."); Gyadu v. Hartford Ins. Co., 197 F.3d 590, 591 (2d Cir. 1999) ("[A] 'complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.'") (quoting Sommer v. Dixon, 709 F.2d 173, 175 (2d Cir. 1983)); see also Sullivan v. Stein, No. 03 CV 1203 (MRK), 2004 WL 1179351, at *14 (D. Conn. May 21, 2004) ("'allegations of conspiracy must be pled with particularity and will not withstand a motion to dismiss if they are conclusory and vague.'") (quoting O'Diah v. New York City, No. 02 Civ. 274, 2002 WL 1941179, at *11 (S.D.N.Y. Aug.

21, 2002)); <u>Romer v. Morgenthau</u>, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000) (there must be some factual pleading of a "meeting of the minds," alleging that Defendants "entered into an agreement, express of tacit, to achieve the unlawful end," including "some details of time and place and the alleged effects of the conspiracy").

In addition, Kvochak's alleged failure to produce requested documents in discovery cannot constitute the required "force, threat, or intimidation" to state a claim under § 1985(2). <u>See, e.g.</u>, <u>McClean v. Int'l Harvester Co.</u>, 817 F.2d 1214, 1218 (5th Cir. 1987) (holding that alleged failures to disclose information and produce documents "are insufficient to state a violation of § 1985(2)"); <u>Jones v. Newman</u>, No. 98 Civ. 7460 (MBM), 1999 WL 493429, at *11 (S.D.N.Y. June 30, 1999) ("[P]laintiff has not alleged that defendants acted by force, intimidation or threat or that he was prevented, as a witness or party, from attending court or testifying freely.   Indeed plaintiff was never called upon to testify in the dismissed actions.") (internal quotation marks omitted); <u>cf.</u> <u>Dooley v. Reiss</u>, 736 F.2d 1392, 1396 (9th Cir. 1984) (holding conspiracy to commit perjury and conceal evidence failed to state a claim under § 1985(2), because "the alleged actions did not influence or seek to influence a juror by force, intimidation, or

threat").

Nor does Kvochak's alleged failure to respond to a subpoena adequately plead the existence of a conspiracy, as is required by § 1985(2). <u>See</u> <u>Frooks v. Town of Cortlandt</u>, 997 F. Supp. 438, 456 (S.D.N.Y. 1998) (to state a claim under § 1985(2) for conspiracy to violate civil rights, the plaintiff must allege conspiracy by a <u>plurality of actors</u>). Furthermore, while Plaintiff's identification of an "embargo on the lawful transfer of the NS-Grant" might implicate a plurality of actors, it nonetheless fails to allege the requisite "force, threat, or intimidation" under § 1982(2). Similarly, as discussed, the embargo allegation is both conclusory and implausible. As stated in the Complaint, it was not until September 17, 2007, that NYU submitted a formal application to transfer the Grant. (<u>See</u> Compl. ¶ 257.)   NINDS accommodated NYU's Grant transfer application by issuing NGAs in November 2007, and April 2008, agreeing to transfer the Grant and identifying Plaintiff as the PI. (<u>See</u> <u>id.</u> ¶¶ 277, 279, 298.)

Plaintiff also fails to identify a plausible injury from Kvochak's alleged deficient subpoena response, as required by § 1985(2). The Complaint states that "the Whistleblower protection case against the College was settled out of court[,]" and to Plaintiff's satisfaction the College returned previously

claimed grant expenditures to NIH.   (<u>See</u> <u>id.</u> ¶ 215.)   <u>See</u> <u>Reilly</u>
<u>v. Natwest Markets Group, Inc.</u>, 178 F. Supp. 2d 420, 428
(S.D.N.Y. 2001) (dismissing § 1985(2) claim because favorable
judgment in federal proceeding meant Plaintiff did not suffer
any injury from Defendants' actions).   Nor can Plaintiff have
suffered injury to property resulting from a retaliatory embargo
on the transfer of the Grant, since, as discussed, Plaintiff has
no property interest in the Grant that would permit her to
unilaterally transfer the Grant.   Moreover, the Grant could not
be transferred until NYU filed an application for its transfer.

For the reasons provided, Plaintiff's § 1985(2) claim
should be dismissed for failure to state a claim for relief.

B.   <u>42 U.S.C. § 1986 Claim</u>

Plaintiff contends that Defendant Finkelstein violated her
rights under 42 U.S.C. § 1986 by acting "negligently and with
reckless disregard of [sic] Plaintiffs' [sic] statutory and
Constitutional [sic] rights [by] permit[ting] the carrying out
of the 42 U.S.C. § 1985 conspiracy to violate her Rights [sic]
of which he was aware."   (<u>See</u> Compl. ¶ 389.)

"[Section] 1986 provides a cause of action against anyone
who having knowledge that any of the wrongs conspired to be done
and mentioned in section 1985 are about to be committed and
having power to prevent or aid, neglects to do so."   <u>Mian v.</u>

<u>Donaldson, Lufkin & Jenrette Sec. Corp.</u>, 7 F.3d 1085, 1088 (2d Cir. 1993).  Further, "a § 1986 claim must be predicated upon a valid § 1985 claim."    <u>Id.</u>; <u>see also</u> <u>Donelli v. County of Sullivan</u>, No. 07 Civ. 2157 (JGK), 2009 WL 2365551, at *7 (S.D.N.Y. July 31, 2009).

Because Plaintiff has no viable claim under § 1985, Plaintiff's § 1986 claim should be dismissed.

## V.   Plaintiff's Privacy Act Claims

Plaintiff brings four claims under § 552a of the Privacy Act.  Defendants seek dismissal of these claims either for failure to state a claim for relief, or, in the alternative, on summary judgment.

The Privacy Act "regulates the collection, maintenance, use, and dissemination of information concerning individuals . . . . It attempts to strike a balance between the government's need to collect and maintain information and the privacy interests of the persons to whom such information pertains." <u>Carton v. Reno</u>, 310 F.3d 108, 111 (2d Cir. 2002) (internal citations and quotations omitted).  The Privacy Act, therefore, allows an individual, among other things, (i) to seek the amendment of inaccurate agency records concerning the individual, (ii) to access certain records relating to the individual, and (iii) to seek damages in the case of harm

resulting from inaccurate record-keeping. See 5 U.S.C. §§ 552a(d)(1), 552a(d)(2) and (3), 552a(g)(1)(C), 552a(g)(1)(D); Doe v. Chao, 540 U.S. 614, 634, 124 S. Ct. 1204, 1216 (2004) (an individual harmed by an agency's violation of provisions of the Act may maintain a civil action for damages in federal district court against the agency). Insofar as a person seeks to amend an agency record, "[i]t is well-established that, 'generally speaking, the Privacy Act allows for correction of facts but not correction of opinions or judgments.'" Mueller v. Winter, 485 F.3d 1191, 1197 (D.C. Cir. 2007) (quoting McCready v. Nicholson, 465 F.3d 1, 7 (D.C. Cir. 2006)); see also Doe v. U.S. Dep't of Justice, 660 F. Supp. 2d 31, 42 (D.D.C. 2009).

A.   5 U.S.C. §§ 552a(e)(5) and (g)(1)(C)

Plaintiff contends that NINDS violated § 552a(e)(5). Specifically, Plaintiff alleges that there is false information in NINDS's records, namely, (i) the NGAs stated that the College relinquished the Grant, whereas Plaintiff contends it was terminated for cause; and (ii) the NGAs suggest that Plaintiff abandoned the research project. (See Pl.'s Mem. at 21.) Based on this alleged false information, Plaintiff argues that NINDS made adverse determinations about her and took adverse actions against her.

Section 552a(e)(5) requires an agency to:

> Maintain all records which are used by the agency in making any determination <u>about any individual</u> with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination.

5 U.S.C. § 552a(e)(5) (emphasis added). Pursuant to § 552a(g)(1)(C), an individual may bring a civil action in federal district court for violation of § 552a(e)(5). That subsection provides a cause of action:

> Whenever any agency . . .
>
> (C) fails to maintain any record <u>concerning any individual</u> with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination <u>relating to the qualifications</u>, character, rights, or opportunities of, or benefits to the <u>individual</u> that may be made on the basis of such record, and consequently a determination is made which <u>is adverse to the individual</u>.

5. U.S.C. § 552a(g)(1)(C) (emphasis added).

To succeed on a claim for damages under §§ 552a(e)(5) and (g)(1)(C), a plaintiff must establish four elements: "(1) he has been aggrieved by an adverse determination; (2) the [agency] failed to maintain his records with the degree of accuracy necessary to assure fairness in the determination; (3) the [agency's] reliance on the inaccurate records was the proximate cause of the adverse determination; and (4) the [agency] acted

64

intentionally or willfully in failing to maintain accurate records." <u>Deters v. United States Parole Comm'n</u>, 85 F.3d 655, 657 (D.C. Cir. 1996); <u>accord</u> <u>Skinner v. U.S. Dep't of Justice and Bureau of Prisons</u>, 584 F.3d 1093, 1097 (D.C. Cir. 2009); <u>Chambers v. U.S. Dep't of Interior</u>, 568 F.3d 998, 1007 (D.C. Cir. 2009) (noting § 552a(g)(1)(C) "requires a <u>specific 'adverse determination'</u> resulting from an agency's failure to maintain accurate records") (emphasis added).

As an initial matter, the Complaint does not identify inaccurate information about Plaintiff. First, whether the College relinquished the grant or was terminated for cause is not about Plaintiff. Second, the NGAs simply do not state that Plaintiff abandoned her research.

Turning to the question of agency determinations, the Complaint, liberally construed, identifies three possible adverse determinations: (i) NINDS's "removal" of Plaintiff as PI of the Grant; (ii) NINDS's "obstruction" of the transfer of the Grant to NYU; and (iii) NINDS's "denial" of UCLA's application to transfer the Grant. (<u>See</u> Compl. ¶¶ 21(c)(ii), 21(c)(iii), 21(g), 232, 285; Pl.'s Mem. at 21-22.) None of these allegations, however, are plausible on their face. Plaintiff thus fails to state a claim for violation of § 552a(e)(5).

1.   <u>NINDS's "Removal" of Plaintiff as PI</u>

Plaintiff asserts that Defendants "de facto and effectively removed [Plaintiff] as the PI on the NS-Grant" by (i) refusing to "copy [Plaintiff] on official correspondence"; (ii) "[r]efus[ing] to communicate with [Plaintiff]"; (iii) "[a]uthoriz[ing] the College to withdraw funds from the NS-Grant"; (iv) processing an NGA "without consulting" Plaintiff; and (v) "obstruct[ing] [Plaintiff's] efforts to . . . transfer [the Grant]." (See Compl. ¶ 21(c)(iii).)

There is no allegation, however, that NINDS made any formal determination to remove Plaintiff as PI of the Grant. Indeed, to remove a PI on a grant, NIH must follow procedures set forth in NIHGPS, and there is no allegation that it did so. See NIHGPS, at 136-37. Further, Plaintiff concedes that she remained the PI on the Grant and "was never formally removed." (See Pl.'s Mem. at 18.) In fact, NINDS issued several NGAs, after the College terminated Plaintiff's employment, all of which explicitly stated that Plaintiff was the PI on the Grant. (See Compl. ¶ 21(g).) Absent allegations of an adverse administrative determination, Plaintiff fails to state a claim under subsection (g)(1)(C). See Bettersworth v. F.D.I.C., 248 F.3d 386, 393 (5th Cir. 2001) (affirming district court's conclusion that "[Plaintiff's] adverse determination claim fails because there was no evidence of an adverse administrative

determination against him"; noting, "at the very least, informal oral or written statements made in the deliberative process *about* a particular administrative determination do not constitute the determination itself").

In fact, Plaintiff's allegations speak only to the perceived negative <u>effect</u> that agency conduct had on her as PI and not to the existence of an agency <u>determination</u>. Again, this is not enough under subsection (g)(1)(C) to establish the requisite adverse <u>determination</u>. See <u>Chambers</u>, 568 F.3d at 1007 (finding that allegation of an "adverse <u>effect</u> . . . is not enough to make out a claim under subsection (g)(1)(C)").

### 2. <u>NINDS's Failure to Transfer the Grant to NYU</u>

The Complaint alleges that NINDS obstructed transfer of the Grant to NYU through an "illegal embargo." (<u>See</u> Compl. ¶ 21(f)(ii).) This allegation is contradicted by the Complaint's recognition that when NYU actually applied for a transfer of the Grant its application was granted. Nonetheless, even if there were a temporary freeze on the transfer of the Grant, this would not be enough to establish the existence of an administrative determination <u>regarding Plaintiff</u>, as required by subsection (g)(1)(C). The Complaint merely alleges that, for a period of time, NINDS refused to make any determination on the transfer of the Grant, pending resolution of the whistleblower action, which

was directly about how much money the College should have returned to the Grant. Although Plaintiff may disagree with NINDS's course of action, it cannot be understood as a determination that is "adverse to the individual," within the meaning of the Act.[16] Since Plaintiff fails to point to any agency determination about Plaintiff based on inaccurate information in its records, dismissal of her subsection (g)(1)(C) claim is appropriate.[17]

### 3.  NINDS's Denial of UCLA's Transfer Application

Plaintiff alleges that UCLA "was declined the application for transfer [by NINDS] because no funds were available anymore in the NS-Grant." (See Compl. ¶ 21(c)(ii).)

---

[16]  Although Plaintiff does not explicitly argue it in her brief, NINDS's only identifiable administrative determinations were the issuance of NGAs. According to Plaintiff, the NGAs falsely convey that Plaintiff resigned, and thereby abandoned, her position at the College. The contents of those documents say no such thing. (See DeCoster Decl. Exs. G, N, P & Q.) In any event, an agency determination to award a federal grant is an agency decision on the use of federal funds. Such a decision is not an agency determination predicated on inaccurate record-keeping "concerning any individual . . . relating to the qualifications, character, rights, or opportunities of, or benefits to the individual." 5 U.S.C. 552a(g)(1)(C) (emphasis added). Nor was NINDS's issuance of NGAs plausibly adverse to Plaintiff. Plaintiff requested issuance of the NGAs since they allowed her to pursue her research. (See Pl.'s Mem. at 22.)

[17]  By the Complaint's own account, NINDS chose to wait until resolution of the whistleblower action before transferring the Grant to NYU. The proximate cause for this purported adverse determination is not, therefore, the reliance on any inaccurate record relating to Plaintiff.

For largely the same reasons relating to the putative NYU determination, Plaintiff fails to allege the existence of an adverse administrative determination regarding Plaintiff, as required by subsection (g)(1)(C). First, even if UCLA were denied a transfer application because no funds remained, that would not point to an adverse determination caused by NINDS's reliance on inaccurate records relating to Plaintiff. In any case, the Complaint concedes that the Grant remained funded. (See, e.g., Compl. ¶¶ 279, 339.) Moreover, the UCLA allegation is not plausible on its face. The Complaint does not allege any facts indicating that UCLA actually submitted a transfer application to NINDS. Indeed, the Complaint implies that only NYU did so because, as between NYU and UCLA, Plaintiff "preferred to have the Grant transferred to NYU." (See Compl. ¶ 220.) In all, Plaintiff's conclusory assertions are not enough to nudge her claim across the line from conceivable to plausible.

\* \* \* \*

Since Plaintiff has failed to allege any plausible adverse determination based on inaccurate records about her, the Court need not address the other elements outlined in Deters that are required to state a violation of § 552a(e)(5). The Court recommends that Plaintiff's claim under § 552a(e)(5) be

dismissed for failure to state a claim.  See <u>Chambers</u>, 568 F.3d at 1007 ("Central to a cause of action under subsection (g)(1)(C) is the existence of an adverse agency determination resulting from inaccurate agency records."); <u>Boyd v. Chertoff</u>, 540 F. Supp. 2d 210, 217 (D.D.C. 2008) (plaintiff could not make out § 552a(e)(5) claim where he failed to allege an adverse determination).

   B.   <u>5 U.S.C. §§ 552a(e)(1),(2) & (6) and (g)(1)(D)</u>

   Plaintiff alleges that NINDS violated 5 U.S.C. §§ 552a(e)(1), (2), and (6).  These sections, as discussed below, require that an agency maintain only "relevant and necessary" information about an individual; collect information from the subject individual "to the greatest extent practicable" when the information "may result in adverse determinations" to the individual; and "make reasonable efforts," prior to disseminating an agency record, to assure that it is "accurate, complete, timely, and relevant for agency purposes."

   Subsection 552a(g)(1)(D) is the Privacy Act's "catch-all" civil remedy provision.  It provides a civil remedy whenever an agency:

>     fails to comply with any other provision of
>     this section, or any rule promulgated
>     thereunder, in such a way as to have an
>     adverse effect on an individual.

5 U.S.C. § 552a(g)(1)(D).

To succeed on such a claim, a plaintiff must establish four elements: (1) a violation of the applicable provision, (2) that the agency's conduct was intentional or willful, (3) that the violation proximately caused an adverse effect on the Plaintiff, and (4) that the plaintiff suffered actual damages. See Fanin v. United States Dep't of Veterans Affairs, 572 F.3d 868, 872 (11th Cir. 2009); Thompson v. Dep't of State, 400 F. Supp. 2d 1, 8 (D.D.C. 2005).

     1.   5 U.S.C. § 552a(e)(1)

Subsection 552a(e)(1) provides that an agency which "maintains a system of records" must:

> maintain in its records <u>only such information about an individual as is relevant and necessary</u> to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President. . . .

5 U.S.C. § 552a(e)(1) (emphasis added).

In this case, the Complaint utterly fails to allege what "information" NINDS maintained in its system of records that was not "relevant and necessary" to accomplish its purpose.

Instead, the Complaint contends that NINDS wrongfully processed the College's relinquishing statement, and included it in its system of records. (See Compl. ¶¶ 137-142; Pl.'s Mem. at

24).   Plaintiff   characterizes   the   relinquishing   statement   -
which   the   College   drafted   -   as   "false   and   fraudulent,"
containing   "two   false   statements,"   namely   (i)   "the   Principal
Investigator   .   .   .   will   resign   [her]   position"   and   (ii)   it
falsely   represented   the   College's   entitlement   to   F&A   Costs.[18]
(See Compl. ¶ 139.)

Yet,   this   does   not   state   a   violation   of   §   552a(e)(1).
First,   the   College's   entitlement   to   F&A   costs   is   not   information
about   Plaintiff.   Further,   the   College's   relinquishing   statement
is   a   standard   form   completed   by   the   College   relating   to
relinquishment   of   its   rights   in   the   Grant.   Any   reference   to
Plaintiff   resigning   is   in   standard   form   language,   and   is   purely
incidental   to   the   purpose   of   the   relinquishing   statement.
Plaintiff   cannot   plausibly   argue   that   it   was   not   "relevant   and
necessary"   for   NINDS   to   maintain   in   its   system   of   records   the
College's   relinquishing   statement.   A   relinquishing   statement   is
a   legal   document   that   informs   the   awarding   agency   of   the
remaining   balance   on   a   grant   and   notifies   the   agency   that   the
grantee   will   no   longer   be   the   recipient   of   grant   funds,   thereby
enabling   continuation   of   the   Grant   its   transfer.   Plaintiff
herself   concedes   that   the   relinquishing   statement   "is   an

---

[18] Elsewhere, Plaintiff infers that the "false statement that
Plaintiff resigned" was "tantamount to stating that she
abandoned her research project." (See Pl.'s Mem. at 23.)

essential document memorializing the financial history of the NS-Grant." (See Pl.'s Mem. at 23.) It is directly relevant to accomplishing the awarding agency's administration of its own grants.

Plaintiff's real gripe concerns NINDS's decision to permit the College to relinquish the Grant. The Privacy Act, however, is not a vehicle for Plaintiff to change the basis of an agency's decisions. See Reinbold v. Evers, 187 F.3d 348, 360 (4th Cir. 1999) ("The Privacy Act does not allow a court to alter records that accurately reflect an administrative decision nor the opinions behind the administrative decision, no matter how contestable the conclusions may be.").

As such, Plaintiff fails to state a violation of § 552a(e)(1), and has no remedy under § 552(g)(1)(D).

2.   5 U.S.C. § 552a(e)(2)

Plaintiff also fails to state a claim for violation of § 552a(e)(2). 5 U.S.C. § 552a(e)(2) requires that an agency:

> collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal Programs. . . .

5 U.S.C. § 552a(e)(2) (emphasis added).

Plaintiff alleges that Defendants violated this section by

73

sending a "questionnaire" to NYU.  Comprising four questions, the so-called questionnaire simply sought to confirm Plaintiff's employment relationship with the University, and to verify the location of the laboratory facilities in which Plaintiff would be working.  (See Compl. ¶ 259.)  Plaintiff claims that by sending the questionnaire, NINDS circumvented Plaintiff as PI, "the single most important person related to the NS-Grant." (Pl.'s Mem. at 25.)  Further, "Defendants were obligated to seek information about [Plaintiff] from her and not from NYU . . . ." (See id. (emphasis added).)

These allegations, however, fail to state a § 552a(e)(2) claim.  First, NINDS is not "obligated," as Plaintiff argues, to seek information about the grantee from Plaintiff alone.  By regulation, NINDS is authorized to obtain information directly from the legal recipient of a grant — the grantee institution. See 45 C.F.R. § 74.53(e).  When NINDS awards a grant, the grantee institution is required to meet certain conditions of the grant, including conditions relating to the grantee's employment relationship with the PI.  NINDS is entitled to ensure that the grantee institution will comply with the terms and conditions of the Grant.  Indeed, in other claims asserted by Plaintiff, she faults NINDS for not making direct inquiries of the College about its use of the Grant.

Further, the typical "subject individual" in a § 552a(e)(2) action does not resemble Plaintiff.  Plaintiff was not, for example, a federal employee subject to an internal agency investigation or a charge of misconduct.  Cf. Carton, 310 F.3d at 108 (investigator who worked for INS was the "subject individual" of INS investigation into alleged misconduct, and even then agency could collect information from third-parties); Hogan v. England, 159 F. App'x 534 (4th Cir. 2005) (electrician who worked at military base was the "subject individual" of Navy investigation into allegations that he was intoxicated at work); Cardamone v. Cohen, 241 F.3d 520, 521 (6th Cir. 2001) (plaintiff superintendent was "subject individual" of employer Department of Defense investigation into alleged misconduct).

And, even if Plaintiff were the "subject individual," § 552a(e)(2) simply requires an agency to collect information from that individual "to the greatest extent practicable."  There is nothing impracticable in NINDS's decision to communicate with NYU about a NINDS grant.  In order to provide the Grant to NYU, NINDS needed to ensure that the PI on the Grant had an employment relationship with the grantee institution.  Nor is it plausible that NIH, which was providing a Grant to NYU, was required to rely solely on Plaintiff for information about her employment relationship with the university.  See Hogan, 159 F.

75

App'x at 537 ("There was simply nothing 'impracticable' in the Navy's decision to investigate the allegations by talking to [third-party] eyewitness"; Navy's failure to interview subject individual before interviewing third-parties did not violate § 552a(e)(2)); Cardamone, 241 F.3d at 520 (questioning third-parties in investigation context did not violate Privacy Act; noting that "practical considerations . . . determine whether an agency has fulfilled its obligations under the Privacy Act to elicit information directly from the subject of the investigation to the greatest extent practicable"); accord Carton, 310 F.3d at 108; Brune v. I.R.S., 861 F.2d 1284, 1288 (D.C. Cir. 1988); see also 5. C.F.R. § 293.104 (codifying OMB Privacy Act Guidelines suggesting that an agency may consult third-parties to verify the accuracy of information supplied by an individual).

Further, § 552a(e)(2) concerns "information" that "may result in an adverse determination." The information that NINDS requested of NYU concerned the administration and transfer of the Grant. In arranging for the transfer of the Grant to NYU, on Plaintiff's request and to Plaintiff's benefit, it is simply not plausible that such information was sought in contemplation of an adverse determination relating to Plaintiff.

As such, Plaintiff fails to state a violation of §

552a(e)(2).

### 3.   5 U.S.C. § 552a(e)(6)

Plaintiff also fails to state a claim under 5 U.S.C. § 552a(e)(6), which instructs that an agency:

> prior to disseminating any record about an individual to any person other than an agency, . . . make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes. . . .

5 U.S.C. § 552a(e)(6).

Plaintiff asserts that NINDS "disseminated and disclosed" several "false [NGAs]" to NYU.   (See Pl.'s Mem. at 22.) Further, Plaintiff claims that the NGAs "were misleading and intentionally concealed material facts."   Namely, "they failed to advise that [the College] was terminated for cause . . . and at all times maintained that the College relinquished the [Grant] . . . impl[ying] that [Plaintiff] resigned from (abandoned) the project."   (See id. at 22; Compl. ¶¶ 279-86.)

Such allegations fail to state a violation of § 552a(e)(6). First, it strains credulity to construe an NGA as a "record about an individual," within the meaning of the Privacy Act.   An NGA is a contractual document that governs the relationship between the awarding agency and the grantee institution. Further, when NINDS issues an NGA, it does so pursuant to its

statutory authority.   Moreover, whether the NGAs stated that the College was terminated as grantee or relinquished its role as grantee says nothing about Plaintiff and, thus, the Privacy Act affords Plaintiff no standing to correct such a statement.[19] And, in any event, Plaintiff's objections to the contents of the NGAs are to no avail.   Plaintiff does not have a right to dictate what goes into an agency's record.   See Reinbold, 187 F.3d at 360 (Privacy Act does not permit an individual to force an agency to rewrite history or change a record to pretend that it recorded some other conclusion; if a record accurately reflects an administrative decision, a court may not change it); Kleiman v. Dep't of Energy, 956 F.2d 335, 337 (D.C. Cir. 1992) (noting Privacy Act is not a vehicle for amending the judgments of federal officials or others as those judgments are reflected in records maintained by federal agencies).

In   sum,   Plaintiff   fails   to   state   a   claim   under   §§ 552a(e)(1), (e)(2), and (e)(6).

C.   5 U.S.C. §§ 552a(b) and (g)(1)(D)

Plaintiff   contends   that   NINDS   violated   the   disclosure

---

[19]   Nothing in the NGAs, or any other documents relied upon by Plaintiff, indicates that the College was terminated for cause. Further, the only allegedly false information that is actually contained in the NGAs relates to the amount of money in the Grant, which has nothing to do with records about Plaintiff. (See DeCoster Decl. Exs. G, N, P & Q.)

provisions of the Privacy Act.  Section 552a(b) provides:

> No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless [certain exceptions apply].

5 U.S.C. § 552a(b).  The Act defines a "record" as:

> any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual . . . .

5 U.S.C. § 552(a)(4).

Here, Plaintiff alleges two "disclosures" in violation of § 552a(b):  (i) an August 31, 2007 email from DeCoster to NYU's Sponsored Research Administrator, copying Kvochak, and instructing NYU on its submission of a change of grantee application, and (ii) an October 12, 2007 email from DeCoster to NYU, again copying Kvochak, with a "questionnaire" inquiring as to Plaintiff's proposed relationship to NYU and the laboratory facilities there.  (See Compl. ¶¶ 246, 248, 259, 261.)

These allegations, however, fail to state a claim under § 552a(b).  First, these emails do not amount to "records" "about

79

an individual," within the meaning of the Act.    Although "record" has a "broad meaning," it must contain "at the very least, personal information about an individual that is linked to that individual through an identifying particular." Bechhoefer v. DEA, 209 F.3d 57, 60 (2d Cir. 2000) (emphasis added); see also Quinn v. Stone, 978 F.2d 126, 133 (3d Cir. 1992) (information is about an individual when it is linked with an identifying particular).    Further, personal information is "information that describes, locates or indexes anything about an individual . . . or that affords a basis for inferring personal characteristics, such as finger and voice prints, photographs, or things done by or to such individual."    See Bechhoefer, 209 F.3d at 60 (quoting legislative history).

In Bechhoefer, the Second Circuit, vacating the District Court's judgment, found that a letter written by a DEA agent containing "both [plaintiff's] name and several pieces of 'personal information' about him, including his address, his voice/fax telephone number, his employment, and his membership [of an organization]" was a "record" within the meaning of the Privacy Act.    Id. at 62.

By contrast, here, neither of the emails is alleged to contain personal information about Plaintiff other than her name.    There is no allegation that Defendants disclosed

80

information such as Plaintiff's address, telephone number, extra-curricular affiliation, or physical/mental characteristics. The August 31, 2007 email merely told NYU how to submit a grant transfer application. (See Compl. ¶ 246; DeCoster Decl. Ex. H.) Further, the October 12, 2007 email sought information, rather than disclosing it. It contained four questions seeking to confirm Plaintiff's employment relationship with NYU, and to determine the location of NYU's proposed laboratory facilities. (See Compl. ¶ 259; DeCoster Decl. Ex. J.) The non-disclosure section of the Privacy Act does not prohibit a government agency from communicating with a proposed legal recipient of a government grant to obtain information necessary to fulfill the terms of the grant.

Accordingly, Plaintiff fails to state a claim under § 552a(b).[20]

VI.  Plaintiff's Cross-Motion for Summary Judgment

Plaintiff cross-moves for summary judgment on her claims for access to records and amendment of records under the Privacy Act, §§ 552a(d)(1), (2) & (3). (See Plaintiff's Motion for

---

[20]  Even were the Court to construe these emails as "records" within the meaning of the Privacy Act, Plaintiff would still fail to state a claim under section 552a(b). DeCoster's copying of Kvochak, the agency's legal counsel, would clearly fall within the Act's "need-to-know" exception. See 5 U.S.C. § 552a(b)(1).

Partial Summary Judgment, dated July 24, 2009.) Defendants oppose Plaintiff's cross-motion. (See Defendants Memorandum of Law in Further Support of Their Motion to Dismiss the Complaint and for Summary Judgment, and in Opposition to Plaintiff's Partial Motion for Summary Judgment, dated Aug. 14, 2009 ("Defs.' Opp. Mem.").)[21]

    A.   Summary Judgment Standard

    Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried, and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986); Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006); Williams v. Utica College of Syracuse Univ., 453 F.3d 112, 116 (2d Cir. 2006). The burden of demonstrating the absence of any genuine dispute as to material facts rests upon the party seeking summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970). Once a properly supported motion for summary judgment is made, the

---

[21] The pages of Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Complaint and for Summary Judgment that were stricken, addressed the same portion of the Complaint on which Plaintiff now seeks summary judgment.

burden shifts to the non-moving party to make an adequate showing to establish the essential elements of that party's case on which it bears the burden of proof at trial.  See Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003).  In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).  Nevertheless, to defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). The non-moving party must put forth "specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e). The non-moving party may not rely on its pleadings, mere allegations, simple denials, conclusory statements, or conjecture to create a genuine issue for trial.  See Anderson, 477 U.S. at 256-7, 106 S. Ct. at 2514; Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007).

    B.   Plaintiff's Access Claim Under § 552a(d)(1)

Plaintiff argues that Defendants unlawfully refused her access requests in violation of 5 U.S.C. § 552a(d)(1).[22] Plaintiff asks the Court to order Defendants to provide her with "full access to her NIH Grant record." (See Pl.'s Mem. at 25.) In opposition, Defendants argue that NINDS provided her with all the records to which she is entitled under the Privacy Act. (See Defs.' Opp. Mem. at 16-18.)

The Privacy Act permits "an individual" to seek access to records relating to her, provided that the record is maintained by the agency within a "system of records." 5 U.S.C. § 552a(d)(1). To prevail on summary judgment, Plaintiff must demonstrate that NINDS failed to provide her with records about her that are contained in the relevant "system of records."

Plaintiff argues that she sent an access request to Plá, the NIH Privacy Act Officer, on March 24, 2008. (See Compl. ¶ 349.) According to Plaintiff, NINDS's response was deficient. In particular, Plaintiff asserts that NINDS refused to provide her with (i) any emails and financial documents "detailing the financial transactions and the communications between NINDS and [the College] from January 1, 2005 through October 31, 2006," and (ii) "document[s] of any kind after July 2006." (See

---

[22] Since the Complaint asserts no FOIA claims, the Court does not address any of Plaintiff's arguments addressed to FOIA that are raised in her Memorandum of Law. (See Pl.'s Mem. at 27.)

Kalderon Decl. ¶ 136; Pl.'s Mem. at 25-26.)

Defendants' submissions, and Plaintiff's own exhibits, however, refute these allegations. In July 2008, Plá provided Plaintiff with numerous financial documents relating to the College that were part of the Grant file, dated between January 1, 2005 through October 31, 2006. (See Supp. Plá Declaration, dated Aug. 14, 2009, ¶¶ 4-5 & Ex. 1.) Further, in July 2008, NINDS provided Plaintiff with "numerous documents in the Grant file that post-date July 2006." (See id. ¶ 6.) For example, "the documents attached to the Kalderon Declaration as Exhibits J, T, U, W, and Y, are all exact copies of documents in [Plaintiff's] grant file. These documents all are dated after July 2006. . . . All [these] documents attached as Exhibits . . . to the Kalderon Declaration were provided to [Plaintiff] as part of her grant file in July 2008."[23]   (See id. ¶¶ 6-11.) Similarly, in response to her Privacy Act request, Plaintiff was provided with some internal emails post-dating July 2006 that were contained in the Grant file. (See id. ¶¶ 9-11, 14 & Ex. 2.)

Indeed, Plaintiff does not appear to contest that she obtained all that was in the Grant file.   Rather, her real

---

[23] These records were "retrieved by [Plaintiff's] name or by the grant number R01 NS39375." (See Plá Decl. ¶ 12.)

objection is directed at the perceived deficiency of its contents. (See Pl.'s Mem. at 26-27; Kalderon Decl. ¶¶ 136-37.) Thus, Plaintiff speculates that there exist additional internal emails that should be part of the relevant system of records, to which she has been denied access. (See Pl.'s Mem. at 28.) Plaintiff contends that "[D]efendants have not searched for and provided hundreds of emails that are apart [sic] of the System of Records." (See id.) Defendants refute this argument, stating that individual employee's "emails are not a category of records contained in the relevant system of records." (See Defs.' Opp. Mem. at 17.)

A "system of records" is defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular." 5 U.S.C. § 552a(a)(5). The Privacy Act requires that each agency publish in the Federal Register a notice of the existence and character of the system of records or system of records notice ("SORN"), for records that the agency maintains under the Privacy Act. See 5 U.S.C. § 552a(e)(4). The SORN must identify the categories of individuals on whom records are maintained and the categories of records maintained in the system. Id.

Here, neither party disputes that the relevant system of

records covering the Grant file was SORN 09-25-0036, entitled "Extramural Awards and Chartered Advisory Committees (IMPAC 2), Contact Information (DCIS), and Cooperative Agreement and Information, HHS/NIH." (See Pl.'s Statement Pursuant to Local Civil Rule 56.1 ¶ 53; Decl. of Daniel Kaiser, dated Apr. 30, 2009 ("Kaiser Decl."), Ex. F, at 1; Pl.'s Mem. at 27-28; Declaration of Karen Plá, dated June 11, 2009 ("Plá Decl."), ¶¶ 9-11, 14 & Ex. 2.)

SORN 09-25-0036 identifies Principal Investigators in the category of individuals covered by the system. There is no reference, however, to internal agency emails in the "categories of records in the system." Rather, the listed categories of records are "funding applications, awards, associated records, trainee appointments, current and historical information pertaining to chartered advisory committees, and past performance information pertaining to contractors." (See Kaiser Decl. Ex. F at 1.) Nor does NIH automatically include all internal emails in the category of records "unless they are made part of a category of records, such as the grant file." (See Plá Decl. ¶ 14.)

Plaintiff cannot sustain her denial of access to records claim based on the agency's decision not to include all internal emails relating to the Grant in its system of records. Assuming

87

such emails exist, NINDS has no obligation to place all emails concerning the Grant in the Grant file.  Moreover, the emails of individual employees are not routinely kept in a system of records retrievable by using Plaintiff's name.  (See DeCoster Decl. ¶ 28; Plá Decl. ¶ 14.)

Nor are Plaintiff's references to NIH's email retention policy in any way dispositive. (See Pl.s' Mem. at 28, citing NIH Records Management Guidelines.)  Whether NIH has a policy governing maintenance of emails does not make them a part of the Grant file.[24]  See Bechhoefer v. United States Dep't of Justice, 312 F.3d 563, 567 (2d Cir. 2002) (section 552a(d)(1) does not require an agency to "search every desk drawer and coat pocket in order to discharge its statutory obligation to make all such material available to [individual requesting access]; noting "[t]he Act clearly envisions that an agency can satisfy its obligation simply and inexpensively by searching its structured files under the individual's name or other identifying symbol"); see also McCready, 465 F.3d at 10 (noting "the language of paragraph (d)(1) expressly limits its applicability to records contained within a system of records") (internal quotation marks

---

[24] Similarly, the NIH Manual Chapter relating to documents that should be included in NIH grant files refers only to "official correspondence" and not internal employee emails.  (See Pl.s' Mem. at 26, citing NIH Manual Chapter 1743, Appendix 1 Part 3, Item 400-B-1.)

and citation omitted); <u>Bettersworth</u>, 248 F.3d at 391-92 ("The threshold issue in any claim alleging denial of access under the Privacy Act is whether the records are maintained in a system of records retrievable by an identifying particular assigned to the plaintiff.") (internal quotation marks omitted); <u>Hudson v. Reno</u>, 130 F.3d 1193, 1206 (6th Cir. 1997) <u>abrogated on other grounds</u>, (records not accessible under Privacy Act because not retrievable by the plaintiff's name); <u>Cuccaro v. Sec'y of Labor</u>, 770 F.2d 355, 359-60 (3d Cir. 1985) (documents relating to agency's investigation of accident involving plaintiff were not tied to plaintiff's name and thus not accessible under the Privacy Act); <u>Wren v. Heckler</u>, 744 F.2d 86, 90 (10th Cir. 1984) (records not accessible under Privacy Act because not retrievable by the plaintiff's name, even though the information related to plaintiff).

In sum, Plaintiff was not entitled to more than was contained in the Grant file.  Having obtained as much, Plaintiff is not entitled to obtain more.  For this reason, the Court recommends that her summary judgment motion on her § 552a(d)(1) claim be denied, and, furthermore, that the claim be dismissed as a matter of law.

C.   <u>Amendment Claims Under §§ 552a(d)(2) & (3)</u>

Plaintiff argues that NINDS declined to amend records about

her in violation of §§ 552a(d)(2) and (3).

Section 552a(d)(2) permits an individual to request amendment of a record pertaining to her that is not "accurate, relevant, timely, or complete," and § 552a(d)(3) permits an individual to request review of an agency decision refusing an amendment request.   In the event of a violation, district courts have broad discretion to "order [an] agency to amend the individual's record in accordance with his request or in such other way as the court may direct."  5 U.S.C. § 552a(g)(2)(A).

Between November 2007 and July 2008, Plaintiff submitted five requests to amend records in the Grant file.  (See Compl. ¶ 310.)  In four of the five requests (dated November 27, 2007, March 19, 2008, March 31, 2008, and July 1, 2008), Plaintiff asked NINDS to issue letters and declarations proclaiming that certain Grant records were false and fraudulent.  For example, Plaintiff requested that NINDS issue letters declaring (i) that the College's relinquishing statement was a "false/fraudulent document," (ii) that the NGA issued to the College was a "false and unlawful certificate," and (iii) that NINDS staff had broken the law.   (See Compl. ¶¶ 223-24, 323-29, 332-33, 344-46.) Plaintiff's fifth request for amendment, dated April 11, 2008, asked, among other things, that NINDS add an additional statement to the revised NGA (transferring the Grant to NYU) to

the effect that "[the NGA] is issued due to the unusual circumstances that were exposed by [Plaintiff], by [Plaintiff's] Whistleblowing complaints of the mishandling of the [G]rant both by the prior grantee [the College] and by NINDS staff." (<u>See</u> <u>id.</u> ¶ 338.) NINDS refused all of these amendment requests.

The Privacy Act "was created to protect individuals against invasions of privacy flowing from the misuse of existing files, not to mandate . . . that files be created and maintained." <u>Smith v. Henderson</u>, No. C 96 4665, 1999 WL 1029862, at *7 (N.D. Cal. Oct. 29, 1999) (internal quotation marks and citation omitted); <u>see also</u> <u>DeBold v. Stimson</u>, 735 F.2d 1037, 1041 (7th Cir. 1984) (The Act does not mandate "an agency to create records that do not exist."); <u>Harter v. IRS</u>, No. Civ. 02-00325 (SOM/KSC), 2002 WL 31689533, at *5 (D. Haw. Oct. 16, 2002) (agency not required to create a record or document in response to individual requests).

Here, Plaintiff's requests clearly seek to dictate the contents of NINDS's record-making. Section 552a(d)(2), however, does not require NINDS to issue declarations and letters attesting to supposed falsities in its records, particularly when these alleged falsities make no reference to Plaintiff. As such, as a matter of law, NINDS's refusal to make the requested amendments does not violate the Act.

In addition to her other demands, Plaintiff's April 11, 2008 amendment contained two more requests. Plaintiff sought: (i) retroactive revision of the NGAs issued in the November 26, 2007 and January 9, 2008 (transferring the Grant from the College to NYU), to reflect $203,132 in remaining grant funds rather than $124,706; and (ii) amendment of the NGAs to state that the Grant was being transferred directly from Sloan-Kettering to NYU, rather than from the College to NYU, thereby editing out the College as the Grant recipient. (See Compl. ¶¶ 336-38.) On April 15, 2008, NINDS informed Plaintiff that it would issue a revised NGA reflecting that $203,132 in grant funds would be transferred to NYU. (See id. ¶ 339). NINDS issued a revised NGA on April 18, 2008 with the amendment to grant funding. (See id. ¶ 298; DeCoster Decl. ¶ 21 & Ex. Q.) NINDS refused, however, to alter the Grant history.

NINDS's refusal to edit out the College from the Grant history cannot be a violation of the Privacy Act. The Privacy Act does not require NINDS to doctor its records to state falsely that the Grant never went from Sloan Kettering to the College. The College was a legal recipient of the Grant. (See DeCoster Decl. ¶ 6 & Ex. D.) And, despite Plaintiff's accusations, Defendants' submissions categorically demonstrate that DGCO never terminated the Grant to the College for cause,

92

and, in fact, lacks the authority to do so.  (See Declaration of

Joseph Ellis, dated Aug. 14, 2009 ("Ellis Decl."), ¶¶ 3-9.)

Even if this were not the case, Plaintiff would not be permitted

to use the Privacy Act to remove from the Grant record the

entire history of the College as recipient of the Grant.[25]  "The

Privacy Act does not permit a court to alter documents that

accurately reflect an administrative action, no matter how

contestable the conclusion may be."  Douglas v. Agric. Stabiliz.

and Conserv. Serv., 33 F.3d 784, 785 (7th Cir. 1994) (Privacy

Act does not allow plaintiff "to rewrite history, changing the

record in Orwellian fashion to pretend that [the agency] reached

some other conclusion"; Privacy Act did not permit farmer to

bring action against agency to alter documents to show that

certain tract of land in federal conservation program contained

six acres, after agency found it contained 3.8 acres; Privacy

Act merely entitled farmer to place in administrative file a

concise statement setting forth reasons for disagreement with

refusal of agency to delete or correct its record); Jones v.

United States Merit Sys. Prot. Bd., No. 8:05CV80, 2005 WL

2445899, at *3 (D. Neb. Oct. 3, 2005), aff'd, 216 F. App'x 608

(8th Cir. 2007) (a plaintiff "may not collaterally attack prior

_____

[25] Nonetheless, it appears that Plaintiff was permitted to add
her own statement to the record, as an attachment to a change of
grantee application.  (See DeCoster Decl. Ex. I at 2.)

decisions of the [agency] by seeking amendment of [agency] decisions through use of the Privacy Act"); see also Reinbold, 187 F.3d at 361 (agency did not violate Act by refusing to expunge agency opinions concerning plaintiff; attempt to expunge negative opinions impermissibly "attempts to relitigate [agency's] decisions through the Privacy Act"); Kleiman, 956 F.2d at 337-38 (Privacy Act not "a vehicle for amending the judgments of federal officials . . . as those judgments are reflected in records maintained by federal agencies"); Doe, 660 F. Supp. 2d at 50 ("Generally speaking, the Privacy Act allows for the corrections of facts but not opinions or judgments") (internal quotation marks and citations omitted); Byrnes v. Merit Systems Protection Bd., No. Civ.A. 04-742 (EGS), 2005 WL 486156, at *2 (D.D.C. Mar. 2, 2005) (holding that the Privacy Act "cannot be used as a vehicle to 'correct' a substantive decision that went against an individual's interest").

In sum, Plaintiff was not entitled to the amendments she sought as a matter of law. Therefore, the Court recommends that her summary judgment motion on her §§ 552a(d)(2) & (3) claims be denied, and, furthermore, that the claims be dismissed.

## CONCLUSION

For the foregoing reasons, the Court recommends that Defendants' motion to dismiss the Second Amended Complaint be

94

granted with respect to the first seven of Plaintiff's Claims. The Court also recommends that Plaintiff's cross-motion for summary judgment on her eighth claim be denied, and, furthermore, that it be dismissed as a matter of law.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (d). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard J. Sullivan, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. Failure to file objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 475 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully Submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: March 10, 2010
        New York, New York